STATE, Respondent, v. WILLIAMSON, Appellant.

*No. 76–160–CR. Submitted on briefs April 6, 1978.—
Decided June 30, 1978.*
(Also reported in 267 N.W.2d 337.)

For the appellant the cause was submitted on the briefs of *Thomas J. Balistreri,* and *Shellow & Shellow* of Milwaukee.

For the respondent the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *Marguerite M. Moeller,* assistant attorney general.

CALLOW, J.   The defendant, Stance Williamson, was tried and convicted of armed robbery as a party to the crime, contrary to sec. 943.32(1)(b) and (2) and 939.05, Stats. He was sentenced to not more than sixteen years, ten months' imprisonment.

The prosecution arose out of the robbery of Read's Lounge on 1306 West Atkinson Avenue, Milwaukee, at approximately-2:40 p.m. on January 22, 1975. There were three eyewitnesses to the events: the tavern owner, Betty Read: a patron, Artie Terrell; and a clerk in the neighborhood grocery store across the street, Donald Smith. Two black men, one shorter than the other, entered the tavern. The shorter of the two went directly to the men's room and returned carrying a sawed-off shotgun. He announced, "This is a hold up, get your hands up," began to pat down the patron Artie Terrell, but stopped when Mr. Terrell told him not to expect to find anything valuable. The shorter robber told Mrs. Read to get the money out of the cash register but then changed his mind and sent both Mr. Terrell and Mrs. Read into the men's room. From the men's room Mrs.

Read heard one robber say, "Get the purse," and "Come on, let's go." When she heard her outside door close, she left the men's room and found her purse missing. The purse contained among other items, a gun, some credit cards, a watch, and a pouch holding approximately six hundred dollars in cash. She ran to the door and saw two figures fleeing down 13th Street. Donald Smith, who happened to be watching the tavern from the grocery store across the street, also saw two figures, one shorter than the other, fleeing the tavern.

The central issue at trial was the identification of the defendant as the shorter robber who held the shotgun. The testimony of the three eyewitnesses was contradictory, and the credibility of each witness was impeached to some degree. The State's chief witness was the tavern owner, Mrs. Read, who identified the defendant in court as the shorter of the two men who robbed her tavern. She also testified that on two prior occasions she identified the defendant as the man who robbed her tavern. She recalled that the shorter robber was wearing a nylon, navy blue parka with fur-lined hood up over his head, blue jeans, and black desert boots. She described him as 5′9″ tall, weighing 145 to 150 pounds, dark skinned, with a round face, mustache, and goatee. At the request of the defense, the trial court admitted into evidence a police report of an on-the-scene interview with Mrs. Read which contained her statement that the shorter robber was 5′10″ to 5′11″ and weighed 176 to 180 pounds. Both of these descriptions of the robber are inconsistent with defense testimony that the defendant is 5′2½″ in his stocking feet.

Mrs. Read's identification testimony was contradicted by both the patron Artie Terrell and the grocery store clerk Donald Smith. Artie Terrell testified that the short robber was 5′8″ or 5′9″ and that the defendant was not either of the two robbers because the defendant's face

was too full and he was too short. He testified that he attended a lineup the day before trial, which included the defendant, but that none of the men in the lineup looked like the man who robbed Mrs. Read's tavern. Donald Smith also testified on behalf of the defense that the defendant could not be one of the men who robbed Read's Lounge because he was too short.

The defendant's brother testified as an alibi witness for the defendant. He stated that he was with the defendant and recalled seeing him at 2:40 p.m. on the day of the crime. His recollection was refreshed by reference to his diary which assisted him in reconstructing the events. However, a police officer testified that prior to trial the defendant's brother examined the diary in the officer's presence and told him there was nothing in his diary regarding his brother. The defendant did not take the stand in his own behalf.

On appeal the defendant does not challenge the sufficiency of the evidence to convict. Instead, he complains of the following errors in the conduct of the trial.

### The State's Tactics in Cross-Examining Artie Terrell

On the day of trial, just prior to the commencement of the State's opening statement, the State informed the court that for the first time since the day of the robbery of Read's Lounge the Milwaukee police had succeeded in locating and subpoenaing the patron Artie Terrell. Defense counsel had also been unable to talk with Artie Terrell prior to trial. The court postponed the commencement of trial for a day to allow both sides to talk with Mr. Terrell and to allow him to try to identify the defendant at an out-of-court lineup. At this lineup Mr. Terrell could not identify any of the participants as the robbers.

Although Mr. Terrell's identification testimony was thus essentially adverse to the State, the State did call

him as its first witness to corroborate Mrs. Read's version of the events which occurred and the clothing worn by the robbers. In anticipation of the unfavorable identification testimony that would be elicited from Terrell by the defense, the prosecutor sought to impeach Mr. Terrell's credibility by reference to some prior inconsistent statements he made to the police at the scene of the crime. She examined him adversely by asking leading questions concerning these prior statements. The defense first objected to these questions as irrelevant but then objected to them as leading. However, the court permitted the prosecutor to ask leading questions, even though Terrell was a State's witness, because her questions were adverse. The prosecutor asked Mr. Terrell whether at the scene of the crime a police officer asked him if he would be able to identify the robber. Mr. Terrell denied that such a conversation took place. The prosecutor then asked Mr. Terrell, "Isn't it a fact . . . that you stated to [the police] at that time that you would not be able to identify the suspects?" Mr. Terrell testified, "No, I didn't." The State never offered evidence which contradicted Mr. Terrell's denials. The defendant, therefore, argues that to ask leading questions without producing the factual predicate for them is improper impeachment of the witness.

The factual predicate for the State's questions is contained in a police report of interviews with Mrs. Read and Mr. Terrell made by one of the investigative officers on the day of the crime. This report showed that "Mr. Terrell stated that he would not be able to identify the suspects, but, if we did hold a line-up, he would be willing to come down and see if possibly he could make an identification." However, because this report also contained a statement of Mrs. Read's that the shorter man was 5'10" to 5'11", heavy, 176–180 lbs., physical features that do not fit the defendant, the State did not offer the report into evidence as proof that Mr. Terrell

had in fact made some statements to the police contradicting his testimony in court. Nor did the State call the detective who made this report and who was on vacation at the time. However, the factual predicate for these questions was eventually admitted into evidence nonetheless. The defense moved for and obtained admission of this police report later in the course of the trial in order to impeach the testimony of Mrs. Read. The full report, including the prior inconsistent statements of both Mr. Terrell and Mrs. Read, was one of the exhibits that went with the jury into the jury room during deliberations.

Though the defense counsel eventually objected to the prosecutor's questions to Mr. Terrell as leading, he never moved to have the questions and the answers stricken at the completion of the testimony on the grounds that the State failed to follow them up with any evidence that prior inconsistent statements were actually made. The defendant concedes that the first time he claimed error on the ground that the State failed to produce a factual predicate to its questions was in a motion for a new trial.

The defendant contends that, despite his failure to object during the course of the trial, he is entitled to raise this claim of error on appeal because the error is of constitutional dimension in that it denied him a fair trial. As the defendant points out, this court will decide a constitutional question improperly preserved below if it is in the interest of justice and where there are no factual issues in need of resolution. *Bradley v. State*, 36 Wis.2d 345, 359–59a, 153 N.W.2d 38, 155 N.W.2d 564 (1967); *Ramaker v. State*, 73 Wis.2d 563, 570, 243 N.W.2d 534 (1976). However, this court has applied this rule only to evidentiary errors which have a direct constitutional basis, such as the admission of evidence derived from an illegal search and seizure,

*State v. Morales,* 51 Wis.2d 650, 187 N.W.2d 841 (1971); illegal identification testimony, *Madison v. State,* 64 Wis.2d 564, 573, 219 N.W.2d 259 (1974); involuntary self-incriminating statements, *State v. Johnson,* 60 Wis.2d 334, 343, 210 N.W.2d 735 (1973); use of ex parte evidence, *Ramaker v. State, supra.* The failure to supply a factual predicate to a leading question is of constitutional dimension only in the sense that, if prejudicial, it denied the defendant a fair trial.

In prior cases in which we have dealt with a failure to supply a factual predicate for questions asked adversely, we have not considered this error to be plain error of constitutional magnitude; rather we have required the error to be preserved by a timely motion to strike, and we have emphasized that the error must be prejudicial. In *State v. Dean,* 67 Wis.2d 513, 534, 227 N.W.2d 712 (1975), we held that it is improper and unprofessional to ask a question which implies a factual predicate which the examiner knows he or she cannot support by evidence. In that case the state did not follow up cross-examination questions with evidence contradicting the defendant's answer, but the court held that the error was not preserved by timely objection, and in any event the error was not prejudicial. In *State v. DeHart,* 242 Wis. 562, 570, 8 N.W.2d 360 (1943), the court held that questions implying that the defendant ran away with a woman not his wife which were not followed up with evidence to show this was true were improper but were not preserved and were not prejudicial in view of the defendant's confession. *See also: State v. Richter,* 232 Wis. 142, 145, 286 N.W. 533 (1939).

In this case the prosecutor did not ask questions with a factual predicate which she knew to be false. She merely asked questions without intending to make the

predicate known to the jury. Some courts have permitted cross-examination where the evidence was available but counsel had no present intention of producing it or where counsel had no factual foundation but a reasonable suspicion that the circumstances might be true. *United States v. Harris,* 542 F.2d 1283, 1307 (7th Cir 1976), *cert. denied* 430 U.S. 934 (1977) ; *Hazel v. United States,* 319 A.2d 136 (D.C. App. 1974). As the court in *Harris* has pointed out, an examiner need not produce a factual predicate in every case because the rules of evidence forbid the use of extrinsic evidence to impeach a witness on collateral matters. *See also:* sec. 906.08(2), Stats.

Defense counsel never objected or moved to strike the testimony for which no factual predicate was supplied. Thus the trial court never had an opportunity to strike the objectionable testimony and provide a curative instruction to the jury. Most important, the trial court did eventually receive into evidence the police report which contained the factual predicate to the Terrell cross-examination, and this report went to the jury room during the jury's deliberations. We do not find that the prosecutor's failure to supply the factual predicate for her adverse examination of Artie Terrell is grounds for reversal here.

*Use of Evidence that the Brother of a Defense Witness Feared the Defendant to Prove Bias on the Part of that Witness*

As part of an effort to impeach the credibility of defense witness Donald Smith, the State offered in rebuttal evidence that in February, 1975, the month

Mrs. Read identified the defendant as one of the robbers, the witness's brother Melvin pointed out the defendant's residence to the police but did so from the floor of the squad car because he was very frightened of being seen. This evidence was offered through the testimony of one of the police officers in the squad car. The State did not call Melvin Smith himself because, according to the prosecutor, Melvin was terrified of a reprisal from the defendant if he testified at the trial. The trial court admitted this testimony as evidence that Donald Smith, in order to protect his brother, may have testified favorably to the defense. The foundation for the admission of this testimony as evidence of bias was testimony that the defendant had asked Donald Smith to testify at the trial, that Donald Smith was familiar with some of his brother's friends, and Donald and his brother had been seen together. However, Donald Smith also testified that he did not know whether his brother was a friend of the defendant. The defense contends that the testimony of the police officer, concerning the frightened behavior of the witness's brother, was too remote to be probative of bias on the part of the witness and that the probative value, if any, is outweighed by the prejudice of showing the defendant to be a man who instilled fear in the witness's brother.

Evidence that the defendant is a man whom people fear is evidence of bad character, and it is inadmissible to prove his guilt. Sec. 904.04, Stats. However, character evidence is admissible for other purposes. Sec. 904.04, Stats. Evidence that Melvin Smith was so terrified of the defendant that he hid while pointing out his house to the police is admissible, despite its implication of bad character, if it has probative value in proving the bias of Donald Smith and if the probative value outweighs its prejudicial effect. Sec. 904.03, Stats.

The bias or prejudice of a witness is not a collateral issue and extrinsic evidence may be used to prove that a witness has a motive to testify falsely. 3A Wigmore, *Evidence,* sec. 948 (Chadbourn rev. 1970). The extent of the inquiry with respect to bias is a matter within the discretion of the trial court.[1] *State v. Bergenthal,* 47 Wis.2d 668, 677, 178 N.W.2d 16 (1970), *cert. denied* 402 U.S. 972 (1971).

The defendant's position is that without proof by the State that Donald Smith knew his brother was afraid of the defendant the evidence is too remote to prove that the witness himself was biased by fear to testify favorably to the defense. To support this position he relies on cases holding that evidence tending to show that a witness's testimony has been suborned is admissible as substantive evidence of the guilt of the

---

[1] It has been observed that "[T]he fact of bias or prejudice of a witness may be shown by a variety of circumstances, provided they are not too remote and have clearly some apparent force as tested by experience, and great latitude is allowed in this respect." 81 Am. Jur.2d *Witnesses,* sec. 547, at 550 (1976); 3A Wigmore, *Evidence,* sec. 949 (Chadbourn rev. 1970); 4 *Jones on Evidence,* 25:9 (6th ed. 1972). C. J. S. also states that bias or prejudice may properly be shown by the relations existing between the accused and the witnesses. 98 C. J. S., *Witnesses,* 550 (1957). Wigmore states that among the more common sorts of circumstances from which bias can be inferred are intimate family relationships of a witness to a person, other than a party, who is involved on one or the other sides, or who is otherwise for or against one of the parties. 3A Wigmore, *Evidence,* sec. 949 (Chadbourn rev. 1970). Wigmore recommends complete exposure of such relationships for the proper evaluation by the trier of fact of the testimony. *Id.* at 786 n. 3. Jones states that "While evidence to show the state of feeling of a witness toward either party is not a collateral matter, and may be received to discredit the testimony of the witness, yet it is held that such evidence should be direct and positive, and not remote and uncertain." 4 *Jones on Evidence,* 25:10 (6th ed. 1972).

defendant only if there is a link beyond mere blood relationship between the person who suborned the witness and the accused himself. *Saunders v. State,* 346 A.2d 448, 452 (Md. 1975) ; *State v. Berube,* 26 A.2d 654, 656 (Me. 1942) ; *State v. Graves,* 301 So.2d 864, 866 (La. 1974) ; *People v. Terry,* 370 P.2d 985, 1001 (Cal. 1962), *cert. denied* 375 U.S. 960 (1962). But in such cases the question is whether evidence of influencing a witness is to be used against the accused himself and not against the credibility of the witness, as is the issue here.

When translated into the fact situation presented here, the cases cited by the defendant do no more than establish that evidence offered to prove bias must be rationally related to the witness sought to be impeached by it. In other words, using the terminology of Wisconsin Rules of Evidence, testimony offered to show bias must be "relevant" on that point. Sec. 904.02, Stats. To be relevant the evidence must have a logical or rational connection with the fact sought to be proved. *Hart v. State,* 75 Wis.2d 371, 386, 249 N.W.2d 810 (1977). At the time the State sought to admit the testimony concerning Melvin Smith's fear of the defendant, there was prior evidence that the defendant knew that Donald Smith witnessed the robbers leaving the tavern and asked Donald Smith to testify at the trial. There was also evidence that Donald Smith may have urged Mr. and Mrs. Read to drop the prosecution of the defendant. We hold that upon such foundation the trial court was entitled to find that evidence that the witness's brother was terrified of publicly cooperating with the police had a logical and rational relationship to the fact of bias on the part of the witness himself to testify favorably to the defense.

Relevant evidence on the issue of a witness's bias must also satisfy sec. 904.03, Stats., requiring the trial court

to weigh the probative effect of the evidence against its prejudicial effect. The trial court held a lengthy conference in chambers on the admissibility of the police officer's testimony. The trial court decided to admit this evidence; though as a result of the objection, the State agreed to structure the testimony so that the jury would not necessarily infer that Melvin identified the defendant's house during the investigation of some other crime. In addition, Donald Smith was given an opportunity on surrebuttal to deny any knowledge that his brother was terrified of the defendant.

This court will not reverse a trial court's determination that probative value of certain evidence outweighs its prejudicial effect unless we find an abuse of discretion and unless the abuse is prejudicial. *Kelly v. State,* 75 Wis.2d 303, 319, 249 N.W.2d 800 (1977). Because the single issue to be resolved by the jury was the issue of which of the three eyewitnesses to the crime to believe, evidence of the bias of any one of these witnesses was crucial. Accordingly, the trial court gave each side leeway in the admission of bias evidence and permitted each side to rebut any evidence of bias admitted into evidence. We hold that the trial court's handling of the bias evidence is proper and cannot be considered an abuse of discretion.

### Admissibility of Evidence of Court Identifications

Besides identifying the defendant in court as one of the two men who robbed her tavern, Mrs. Read also testified to two prior out-of-court identifications of the defendant. Fourteen days after the robbery Mrs. Read identified the defendant from some photographs shown to her by the police. The next day the police held a lineup, and Mrs. Read again identified the defendant as one of the men who robbed her tavern. The defendant

challenges Mrs. Read's testimony concerning her prior out-of-court identifications as inadmissible hearsay.

Any previous out-of-court statement of a witness which is offered as substantive evidence of the truth of the matter asserted meets the definition of hearsay in sec. 908.01(3), Stats. *See also: Green v. State,* 75 Wis.2d 631, 250 N.W.2d 305 (1977). Such prior out-of-court statement of a witness is excepted from the definition of hearsay only if one of three circumstances contained in sec. 908.01(4)(a), Stats., is met: The statement is "1. Inconsistent with his testimony, or 2. Consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive, or 3. One of identification of a person made soon after perceiving him." Thus Mrs. Read's prior out-of-court identifications of the accused, offered to prove that the defendant is the person who committed the crime, is inadmissible hearsay unless it meets one of these three exceptions. The State concedes Mrs. Read's prior identification testimony was not a prior inconsistent statement and was not a prior consistent statement offered to rebut a charge of recent fabrication. Therefore, this testimony is admissible only if it is testimony "of identification of a person made soon after perceiving him," under sec. 908.01(4)(a)3, Stats.

The defendant argues that a statement "of identification of a person made soon after perceiving him" must mean a statement of identification made soon after having perceived the suspect at the scene of the crime. The defendant argues that, since Mrs. Read's identification of the defendant was not made until fourteen days after the crime, her statements of identification were not made "soon after perceiving him" and are not admissible under sec. 908.01(4)(a)3, Stats. The State argues that a statement "of identification of a person

made soon after perceiving him" is a statement made soon after perceiving the accused during the identification process. Since it is undisputed that upon viewing the photographs and the lineup Mrs. Read immediately recognized the robber, the State argues that the requirements of sec. 908.01(4)(a)3 have been met.

Sec. 908.01(4)(a)3, Stats., was modeled on what is now Fed. R. of Evid. 801(d)(1)(C).[2] It is identical to the federal rule except that in the state rule the drafters added the word "soon." The weight of authority at the time the federal rule was drafted was that any prior out-of-court identification of the accused was admissible as a hearsay exception on the issue of the identity of the perpetrator and that the manner and circumstances under which the identification was made, presumably including the length of time between the crime and the identification, merely affected the weight to be given the identification testimony. Annot., 71 A.L.R.2d 449 (1960). The notes of the federal drafters show that the federal rule was intended merely to codify the existing majority view that all prior identification testimony is a hearsay exception. *See:* Federal Advisory Committee's Note, reprinted in 59 Wis.2d at R239–40. The federal drafters' notes point out that the basis for the admission of prior out-of-court identification testimony is "the generally unsatisfactory and inconclusive nature of courtroom identifications as compared with those made at an earlier time under less suggestive conditions." 59 Wis.2d at R239.

The Judicial Council Committee's Note contains no suggestion of how the state drafters intended to affect the operation of the federal rule by the addition of the word "soon." If by that addition the drafters intended to limit the admissibility of testimony of prior out-of-court identifications only to those identifications which

---

[2] The federal rule has only been in effect since October, 1975.

occur soon after the events of the crime, then the drafters would have intended to make a substantial change in the federal rule. Under the federal rule the time elapsing between the original perception of the accused at the scene and the perception of him during the identification is a matter of weight and not admissibility. We believe that, if the drafters intended to make such a significant change in the federal rule, they would have pointed it out in their note.

The defendant argues that a construction of "soon after perceiving him" in this case to mean soon after perceiving the accused during the identification process is contrary to the language of the rule which refers to a perception of the accused rather than to a perception of a likeness of the accused, such as a photograph. The defendant suggests that, since it is unlikely that the drafters intended to permit live lineup identification evidence while excluding photographic or videotape identification evidence, the phrase "soon after perceiving him" must be construed to mean soon after perceiving the accused during the events giving rise to the case.

However, we do not agree that "soon after perceiving him" cannot be construed to mean soon after perceiving the accused or a likeness of the accused during any identification procedure. The meaning of this rule is unclear, and in interpreting it we must try to effectuate the intent of the drafters. The rationale for admitting prior identification testimony in the first instance is that identifications made closer to the events of the crime and before judicial proceedings have commenced are typically more reliable than an identification made at trial. A construction of our rule which would exclude some testimony of prior identifications merely because the lineup or other identification procedure did not occur soon after perceiving the person at the scene of the crime would be contrary to the spirit and purpose of the

rule. Though we recognize that our construction is not required by the language of the rule, it is the one which we believe best effectuates the intent of the drafters to make prior out-of-court identification testimony admissible as a general rule. We hold that sec. 908.01 (4) (a) 3, Stats., excepts from the hearsay rule all statements of identification made soon after perceiving the suspect or his likeness in the identification process. As so construed, Mrs. Read's testimony concerning her two prior identifications of the defendant clearly meets this test.

*References in the Testimony to the Existence of Other Prosecutions in which the Defendant is Involved*

During the State's case in chief, a police officer testified about Mrs. Read's lineup identification of the accused and made the two references to the defendant's involvement in another criminal case. First, the prosecution asked the officer to describe the positions of the men in the lineup, and the witness replied that "There were seven men on the stage. A lieutenant gave certain questions to these people and they moved in different directions. *They were viewed by the victims of several crimes.*" (Emphasis supplied.) Second, in response to a question concerning the custody of the card containing Mrs. Read's identification of the defendant at the lineup, the witness testified "It started in the detective bureau, attached to the complaint, and then it went to the district attorney's office *and then it was brought into this court on the last case.*" (Emphasis supplied.)

At the next conference in chambers, defense counsel moved to have all testimony of the witness stricken and an instruction to the jury to disregard it. The court acknowledged that the references in the testimony to other crimes were error, but the court denied the motion to strike all of the witness's testimony. Defense counsel did not move to strike only the objectionable answers on

the grounds that to do so would only emphasize that portion of the stricken testimony that was prejudicial. The State offered to elicit testimony from the officer that there were other victims at the lineup to view other men and to have the court instruct the jury that "the last case" referred to earlier hearings in this case. Defense counsel declined these offers on the theory that such curative efforts do not work. Now on appeal the defendant claims that this "other crimes" evidence was reversible error.

Both sides agree that the witness's reference to other criminal prosecutions involving the accused was error. The only disputed issue is whether the remarks require a new trial. Whether remarks of witnesses or counsel have such a prejudicial effect that a new trial should be granted is a question of fact. *Roehl v. State,* 77 Wis.2d 398, 412, 253 N.W.2d 210 (1977); *Harris v. State,* 52 Wis.2d 703, 705, 191 N.W.2d 198 (1971). Where as here the remarks do not go directly to the issue of guilt, they must be considered in the context of the other facts of the case, including the curative effect of striking the remarks and instructing the jury to disregard them. *Roehl v. State, supra* at 412; *Harris v. State, supra* at 705; *Buckner v. State,* 56 Wis.2d 539, 544, 202 N.W.2d 406 (1972).

As the State points out on appeal neither of the challenged statements directly reveal the fact of other crimes.[3] The witness's reference to the fact that the

---

[3] *Compare*: *Harris v. State, supra* (police officer testified that the accused was being kept in an apartment when "another known convicted safecracker appeared"); *Hardison v. State,* 61 Wis.2d 262, 273-5, 212 N.W.2d 103 (1973) (accomplice testified that after the crime the accused "laughed about the robbery they had pulled and the ones they had done before"); *Buckner v. State, supra* (witness stated that the accused was attempting "another robbery" just prior to his arrest).

lineup was viewed by "victims of other crimes" and that Mrs. Read's lineup identification card was in court "for the last case" could give rise to inferences other than the inference that the defendant was being prosecuted for another crime.

Even the direct references to other criminal activity have not required a new trial if a sufficient curative instruction was given. The court has held that prejudice to a defendant is presumptively erased from the jury's collective mind when admonitory instructions have been properly given by the court. *Roehl v. State, supra* at 413. In this case the trial court appeared willing to strike the tainted remarks or give a curative instruction or permit remedial testimony from the officer himself. Yet for strategic reasons the defense rejected these alternatives. We hold that counsel's deliberate election to decline to move to strike the objectionable testimony or for a curative instruction constitutes a strategic waiver of the error. We also point out that the trial judge weighed the prejudicial effect of the witness's remarks. He observed that they came out as "an afterthought" and were "garbled with other parts of the answer." He concluded that "in totality, I do not believe the defendant was prejudiced." We agree.

### Failure to Give a Requested Instruction on Eyewitness Identification Testimony

The defendant requested five jury instructions concerning eyewitness identification testimony: One instruction stated essentially that the State must prove beyond a reasonable doubt that the defendant perpetrated the crime, that identification testimony is an expression of belief or impression, and that its value depends upon such factors as the opportunity the witness had to ob-

serve, the lighting, the witness's previous acquaintance with the defendant, etc. Another stated in effect that identification testimony must be scrutinized carefully. Another stated that no testimony is more uncertain and less reliable than identification testimony and that in numerous cases such testimony has been in error. Another included a list of factors the jury should consider in evaluating identification testimony. This instruction was derived from recommended federal practice.[4]

The trial court rejected all of these instructions and gave the standard instruction on eyewitness identification, Wis. J I—*Criminal,* No. 141, which states simply that:

"The identification of the defendant is in issue in this case. If you find that the crime alleged was committed, before you may find the defendant guilty you must be satisfied beyond a reasonable doubt that the defendant is the person who committed [the crime]."

In rejecting the defendant's requested instructions and in giving the standard instruction, the court relied on *Chapman v. State,* 69 Wis.2d 581, 230 N.W.2d 824 (1971). In *Chapman,* the defendant requested instructions to the effect that identification testimony is opinion evidence to be scrutinized with great care and caution. This court held that giving the standard jury instructions on eyewitness identification, plus the standard jury instructions on the credibility of the witnesses and the presumption of innocence, sufficiently and adequately informed the jury of the possibility of human error and the need to scrutinize carefully all testimony, including identification testimony.

---

[4] *See, e.g.,* model instructions contained in *United States v. Holley,* 502 F.2d 273, 277–8 (4th Cir. 1974); *United States v. Telfaire,* 469 F.2d 552, 558–59. (D. C. Cir. 1972) (Per Curiam); *United States v. Barber,* 442 F.2d 517, 528 (3d Cir. 1971), *cert. denied* 404 U.S. 958; *United States v. Hodges,* 515 F.2d 650 (7th Cir. 1975).

The only difference between the instructions given in this case and the identification instructions requested by the defendant is that (1) the instructions requested included statements to the effect that identification testimony is highly suspect, and (2) the requested instructions applied the factors to be used in weighing the credibility of testimony in general to the problem of identification testimony in particular. In *Chapman,* this court held that an instruction characterizing all identification evidence as suspect is improper because it is too favorable to the defense. 69 Wis.2d 585–6. In *Chapman,* this court also held that instructions geared specifically to identification testimony may be redundant in light of the other instructions given. 69 Wis.2d 585–6.

In arguing that the eyewitness identification instructions given are inadequate in this case, the defendant relies on some specific identification instructions that have been recommended by federal courts for use where the case turns on the identification of a single eyewitness.[5] At least some of the instructions recommended by the federal courts would also have been correct under Wisconsin law. However, we have very recently held that "A trial court has wide discretion as to instructions. [Citation omitted.] If the instructions of the [trial] court adequately cover the law applicable to the facts, this court will not find error in the refusal of special instructions even though the refused instructions themselves would not be erroneous." *State v. Lenarchick,* 74 Wis.2d 425, 455, 247 N.W.2d 80 (1976).

Despite the fact that instructions based on federal law would have also been correct, the trial court did not err in rejecting them. Though Mrs. Read's identification was disputed by others, it is undisputed that the tavern was well lighted, that she got the best look at the robbers

---

[5] *See:* Cases cited in Footnote 4, *supra.*

of all of the three eyewitnesses, and that she identified the defendant relatively soon after the crime. Though trial courts must recognize that standard jury instructions must on occasion be tailored to the specific case, this is not a case which necessarily requires an elaborate jury instruction on the factors to consider in weighing identification testimony. The trial court instructions were proper. The instructions given in this case admonished the jury to scrutinize all of the evidence with utmost caution, that the weight given to the witnesses' testimony may vary, that the jury must take into account their own common knowledge of life, that in considering credibility they should consider the witnesses' conduct, demeanor, interest or bias, clearness of recollection, opportunity to observe and know the matters testified to, their intelligence, their motives, prior inconsistent statements, prior convictions of crime, and the reasonableness of their testimony. We find these instructions given in this case entirely adequate here.

### *Refusal to Give a Falsus In Uno Instruction*

The trial court refused to give the requested *falsus in uno, falsus in omnibus* instruction, Wis. J I—*Criminal,* No. 305. In order for the *falsus in uno* instruction to be appropriate, the false testimony must be on a material point and must be willful and intentional. Mere discrepancies in the testimony that are most likely attributed to defects of memory or mistake are no basis for rejecting a witness's testimony entirely. *Pumorlo v. Merrill,* 125 Wis. 102, 111, 103 N.W. 464 (1905).

The evidentiary basis for the defendant's request for a *falsus in uno* instruction is Mrs. Read's admission that she was mistaken when she testified at a prior hearing in the case that she identified the defendant from photographs on a television screen at the Safety Building in

Milwaukee. In fact, Mrs. Read did not identify the defendant at this particular identification procedure. Mrs. Read consistently testified that her prior testimony was in error because she was confused. There is no evidence other than the fact of the inconsistent statements themselves suggesting intentional or willful perjury. Testimony of police officers corroborated her trial testimony that she did not positively identify the accused at a televised procedure but that she did so originally from photographs and again at an in-person lineup.

The trial court rejected the request for a *falsus in uno* instruction on the basis that the jury was adequately apprised of how to evaluate the credibility of Mrs. Read by the instruction regarding prior inconsistent statements. The *falsus in uno* instruction is not favored in the law. *See:* Annot., 4 A.L.R.2d 1077 (1949). We agree with the trial court's conclusion that *falsus in uno* instruction was not appropriate under the circumstances presented here.

*Use of the Word "Alibi" in the Alibi Instruction*

The defendant claims that the standard instruction on the alibi defense given by the trial court was improper because it includes two references to the word "alibi," a word which connotes guilt. The common meaning of "alibi" is "a plausible excuse esp. for failure or negligence." *Webster's Third New International Dictionary* (1966) at 53. However, the standard jury instruction, Wis. J I— *Criminal,* No. 775, makes clear that the word "alibi" is used in its technical legal sense. Even if the word "alibi" carried some adverse connotations, the alibi instruction clearly admonishes the jury that the State must prove beyond a reasonable doubt that the defendant was present at the commission of the crime and that,

if the jury has a reasonable doubt that he was not, they must find the defendant not guilty. The jury must be presumed to have followed these explicit instructions. *Roehl v. State, supra.* We find this challenge to the alibi instruction to be without merit.

### Duplicitousness in the Robbery Instruction

Armed robbery can be committed either by stealing with force or by stealing with the threat of force. Sec. 943.32(1)(a), (b), and (2), Stats. Sec. 943.32(1)(a) and sec. 943.32(1)(b) are two distinct crimes. *Schleiss v. State,* 71 Wis.2d 733, 239 N.W.2d 68 (1976). The model jury instructions for armed robbery discuss the crime committed in both ways. Thus as the State concedes, the model instruction for armed robbery is, technically, duplicitous. However, it is impossible for such duplicitousness to be error where, as here, the crime charged is sec. 943.32(1)(b), Stats., armed robbery by threat of force. Any juror who conceivably convicted the defendant of armed robbery by force would have also convicted the defendant of armed robbery by threat to use force. Only in a case where an accused is charged and tried under subsection (a), armed robbery by force, can the instruction permitting the jury to convict if it merely finds the threat of force be duplicitous in any material way. Because the defendant was charged with armed robbery by threat of force, the armed robbery instruction could not have permitted some jurors to convict him of a crime not charged.

*By the Court.*—Judgment affirmed.