**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**March 22, 2022**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP1836-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2014CF4982

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

V.

ROBERT R. MCCORKLE,

    DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Milwaukee County: DANIEL L. KONKOL, Judge. *Affirmed.*

Before Brash, C.J., Donald, P.J., and White, J.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM. Robert R. McCorkle appeals the judgment of conviction entered following his jury trial. McCorkle contends that the trial court erred when it admitted:   (1) a detective's testimony regarding a witness's identification of McCorkle; (2) recorded jail phone calls; and (3) the victim's prior statements. In addition, McCorkle argues that these errors cumulatively deprived him of a fair trial. We disagree and affirm.

## BACKGROUND

¶2    On July 5, 2014, Richard Conn was shot in the head. Conn later died as a result of the gunshot wound. Conn was to be a State's witness in *State v. Hakeem Harris*, Milwaukee County case No. 2014CF2476. The State's theory was that Conn was shot to prevent him from testifying against Harris.

¶3    McCorkle, who was alleged to be an associate of Harris, was charged with three counts relating to Conn's death:   (1) first-degree intentional homicide using a dangerous weapon, as a party to a crime, and as a repeater; (2) possession of a firearm by a felon, as a repeater; and (3) battery to a witness using a dangerous weapon, as a party to a crime, and as a repeater.

¶4    Prior to McCorkle's trial, the State moved to admit a recorded police interview in which Conn had identified Harris. The trial court denied the State's request to play the video of the interview, but ruled that the State could use Conn's statements in the criminal complaint against Harris and testimony from Harris's preliminary hearing.

¶5    McCorkle's jury trial began on June 1, 2015, and spanned a period of four days. Jimmie Wade III testified that he was across the street when Conn was shot. According to Wade, two men approached Conn, and the man who shot

2

Conn wore a "fishing hat" with a drawstring and a white t-shirt. Another witness, Curtis Buck, told police that the shooter wore "a sunhat maybe with strings down the side," a blue and white striped t-shirt, and cargo shorts.[1]

¶6　The State also played a police interview of six-year-old J.J.[2] J.J. told police that she was playing outside of her house when she heard a gunshot. She saw two men: one in a blue shirt and one in a red shirt. The man with the blue shirt had a gun[3] and wore a hat "with sticks" that looked like "wood." J.J. said that after the shooting, both men ran through "the cuts" between the houses.

¶7　Sandra Wren, who was in her backyard, testified that she heard a gunshot and then saw two men run through a gangway two houses down. On the gangway, police found a plastic sandwich bag with nine individual corner cuts of suspected marijuana. Nicholas Kleine, a forensic scientist, testified that McCorkle was determined to be the source of DNA on three of the corner cuts.

¶8　Although the shooting itself was not captured on video, surveillance footage from the area showed three men exit a silver Chevy Impala. Detective Keith Kopcha testified that the person exiting from the driver's side door was a male wearing a "bucket hat with a brim around it," which some people refer to as a fishing hat or army hat, a light blue shirt, light colored shorts, and darker shoes

---

[1] Buck's statements to the police were admitted through Detective Dennis Devalkeneare. When Buck testified, he denied seeing who shot Conn. Another detective, Michael Sarenac, testified that, prior to Buck's testimony, Buck said that he was afraid to be seen on the witness stand.

[2] Due to J.J.'s age, we opt to use initials for confidentiality purposes.

[3] J.J. initially said the man wearing the red shirt was holding the gun, but she then clarified that the man with the blue shirt held the gun.

with a white sole. According to Kopcha, the surveillance footage also showed the person with the bucket hat and a person wearing a white t-shirt walk towards the scene of the shooting, disappear from camera view, and then reappear running away from the scene and cutting through yards.

¶9 Six days after the shooting, police located the Impala that was believed to be the car in the surveillance footage. The Impala was abandoned in the middle of the street. Inside the Impala, police found a notice from the Department of Motor Vehicles for failure to report an accident with the name of Robert McCorkle on it and a pair of black latex gloves. Marlisa Harris was the registered owner of the car.

¶10 Latent Print Examiner Matthew Maudlin testified that he examined two print cards from the Impala. Maudlin testified that one of the prints matched McCorkle's left palm print. The other print was identified as Marlisa's right palm print.

¶11 Marlisa, who had dated McCorkle for two months, testified that McCorkle had used her Impala on the day of the shooting.[4] Marlisa testified that her Impala was currently in the possession of the police. When asked if McCorkle told her what happened to her car, Marlisa replied that "He told me that he loved me and he did not want to go back to jail, and that there was a man in a suit following him." Marlisa said that McCorkle thought the man in the suit was a detective. The State showed Marlisa a still photo taken from the surveillance footage. Marlisa stated that the photo showed her vehicle and McCorkle. Marlisa

---

[4] Marlisa initially told the police that someone named "MJ" had the car, but later told the police it was McCorkle.

stated she believed it was McCorkle because of his "posture." Marlisa also wrote on another surveillance photo that McCorkle "has a shirt … [s]imilar to this[.]" In addition, Marlisa testified that McCorkle owned a tan "fisher hat" with a "black string."

¶12   Conn's brother, Levandior Conn, also identified McCorkle as one of the suspects in the surveillance video. Levandior testified that McCorkle was an "associate" of Harris. In addition, Levandior testified that he had conversations with Conn about being a witness against Harris.

¶13   Nine days after the shooting, McCorkle was arrested in New London, Wisconsin. Tracy Delrow, who gave McCorkle a ride to New London, testified that McCorkle said "he would like to get away for a while[.]" Delrow also testified that he had seen McCorkle wearing a khaki or green "fishing hat" a couple of times and driving an Impala.

¶14   Detective Kopcha interviewed McCorkle after his arrest. Kopcha noted that McCorkle's shoes were "consistent" with the shoes captured on video of the suspects. McCorkle said he knew Harris and admitted that he had calls with Harris while Harris was in custody. Kopcha showed McCorkle a photo of Conn and McCorkle denied knowing Conn or knowing Conn's name or his nicknames, which included the nickname "Gutta." McCorkle did not recall his specific whereabouts on July 5, 2014, but thought he was driving around picking up plates of food other people had prepared for him for the Fourth of July. McCorkle also denied knowing about or driving the silver Chevy Impala.

¶15   Consistent with the trial court's pre-trial ruling, Detective Kopcha testified that he had interviewed Conn about a shooting that occurred on May 17, 2014, in which Conn was a victim and a witness. According to Kopcha, Conn

identified Harris as the shooter. Conn was named in the criminal complaint against Harris.[5] In addition, Detective Luke O'Day told the jury that he had testified against Harris at a preliminary hearing. At that hearing, O'Day testified in open court that Conn had identified Harris as shooting at Conn.

¶16     At the conclusion of the trial, portions of recorded jail calls between Harris and McCorkle were played for the jury. In a call made one day after Harris's preliminary hearing, Harris asked McCorkle "what are you exactly down for?" Later, McCorkle told Harris that he has an "avenue" and a "little bitch with a car," which he gets when she goes to work. In addition, in a call two days after Conn was killed, McCorkle found it amusing that people were saying that "Gutta" was dead and going to McCorkle's family house thinking it was McCorkle that was killed.[6] McCorkle also referred to Conn's death as a "motion to suppress witness."

¶17     The jury found McCorkle guilty as charged. The court sentenced McCorkle to life in prison with eligibility for extended supervision in 2060. This appeal follows. Additional relevant facts are discussed below.

## DISCUSSION

¶18     On appeal, McCorkle argues that the trial court erred when it admitted: (1) testimony from a detective regarding Levandior's identification of McCorkle; (2) the recorded jail phone calls; and (3) Conn's statements in the

---

[5] The State moved a copy of the criminal complaint into evidence.

[6] In a strange coincidence, McCorkle also goes by the nickname, "Gutta."

criminal complaint against Harris.  In addition, McCorkle argues that these errors cumulatively deprived him of a fair trial.  We address each issue in turn.

### I.  Testimony regarding Levandior's identification of McCorkle

¶19     At trial, Levandior identified McCorkle as one of the suspects in the surveillance video.  Levandior testified that while he "didn't put a face on it," he could tell that the person wearing the blue shirt was McCorkle based on "the body frame" and the person's manner of walking.  Levandior further testified that he had seen Harris and McCorkle interact on a couple of occasions.

¶20     On cross-examination, the defense elicited testimony that Levandior had known McCorkle for sixty days and had only seen him three times when Levandior was in the hospital under sedation.  According to Levandior, he saw McCorkle walking to and from his hospital room.

¶21     Subsequently, the State presented testimony from Detective Brett Huston.  Huston testified that he showed the surveillance video to Levandior.  The defense objected to any testimony other than an affirmation that Levandior had identified someone in the video.  The court overruled the objection and Huston testified that Levandior:

> identified the individual in the blue shirt and white shorts as … Robert McCorkle, the defendant.  In fact, when I showed him this video, I didn't ask him any particular person that I was inquiring about.  And when he saw this piece of video, he jerked in his chair and immediately raised his voice and started pointing at the person in the blue.  And he said that he knew based on the build, the gait, his physical walk, and that it was the defendant Robert McCorkle.

The defense then objected again and moved to strike the entire answer because "it included nonverbal assertions that were not of identification."  The court initially

7

sustained the objection and stated "[t]hat part of the answer is stricken. The jury is to disregard that."

¶22 The State then argued that the statements were admissible as "statements made soon after perceiving the identification[.]" *See* WIS. STAT. § 908.01(4)(a)3 (2019-20).[7] The following day, the trial court issued a decision overruling the objection and instructed the jury that they could consider the testimony. The court explained that the testimony was "just circumstantial evidence of the conduct from which inferences could be drawn by the trier of fact. I don't think it was intended as an assertion. So the action would be admissible."

¶23 McCorkle argues that the trial court erred in overruling the defense's objections to Huston's testimony. We disagree.

¶24 Hearsay is "a statement, other than one made by the declarant while testifying at the trial … offered in evidence to prove the truth of the matter asserted." WIS. STAT. § 908.01(3). Hearsay testimony is inadmissible at trial unless permitted by some other rule or statute. WIS. STAT. § 908.02. Whether a statement is admissible under a hearsay exception is a question of law reviewed *de novo*. **State v. Joyner**, 2002 WI App 250, ¶16, 258 Wis. 2d 249, 653 N.W.2d 290.

¶25 In this case, Detective Huston's testimony was admissible pursuant to WIS. STAT. § 908.01(4)(a)3., which excludes from the definition of hearsay a statement that is "[o]ne of identification of a person made soon after perceiving the person." It is apparent from the record that the contested statements were

---

[7] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

statements of identification made soon after Levandior perceived McCorkle in the surveillance video.

¶26 McCorkle argues that Detective Huston's testimony was inadmissible under *State v. Williamson*, 84 Wis. 2d 370, 267 N.W.2d 337 (1978), *abrogated on other grounds by Manson v. State*, 101 Wis. 2d 413, 304 N.W.2d 729 (1981), which involved the robbery of a tavern. *Williamson*, 84 Wis. 2d at 375. In *Williamson*, during the trial, the tavern owner testified to two prior out-of-court identifications of the defendant. *Id.* at 385. Fourteen days after the robbery, the owner had identified the defendant from some photographs the police showed her. *Id.* The following day, the police held a lineup and the owner again identified the defendant. *Id.* The defendant argued that the prior out-of-court identifications were inadmissible hearsay because they were not made "soon after" perceiving the defendant at the scene of the crime. *Id.* at 385-86. The court rejected the defendant's argument, concluding that "we do not agree that 'soon after perceiving him' cannot be construed to mean soon after perceiving the accused or a likeness of the accused *during any identification procedure*." *Id.* at 388 (emphasis added).

¶27 McCorkle argues that *Williamson* is distinguishable because Levandior was not "an eyewitness to the actual crime in question." However, nothing in WIS. STAT. § 908.01(4)(a)3. requires that a person be an eyewitness to the crime. Moreover, contrary to McCorkle's suggestion, it does not matter that the defense only sought to exclude Detective Huston's testimony and not Levandior's. Both testified at trial and were subject to cross-examination. Therefore, we conclude that the trial court did not err in admitting the testimony.

9

## II. Recorded jail calls

¶28 McCorkle argues that the recorded jails calls played at trial were not admissible because the calls were not properly authenticated.[8] We disagree.

¶29 "[A]uthentication requires that a [trial] court conclude, within its discretion, that the finder of fact could reasonably determine that the evidence sought to be admitted is what its proponent says it is." *See State v. Burch*, 2021 WI 68, ¶32, 398 Wis. 2d 1, 961 N.W.2d 314; WIS. STAT. § 909.01. WISCONSIN STAT. § 909.015 lists examples of authentication methods. One method is "by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." Sec. 909.015(5).

¶30 Here, Detective Huston testified that he was able to identify McCorkle's voice because he was with Detective Kopcha when he interviewed McCorkle. Huston also testified that he monitored and listened to phone calls by Harris. Huston testified that he could identify both Harris and McCorkle based on their voices.

¶31 Further, to the extent that McCorkle challenges Detective Huston's identification of his voice, this goes to the credibility and weight of the evidence, not the admissibility. The credibility of witnesses and the weight to be accorded to their testimony are matters for the jury to decide. *See State v. Perkins*, 2004 WI

---

[8] McCorkle also argues that his Sixth Amendment right of confrontation was violated because the State introduced statements made by Harris without producing Harris at trial. This issue, however, was never raised before the trial court, and will not be considered on appeal. *State v. Dowdy*, 2012 WI 12, ¶5, 338 Wis. 2d 565, 808 N.W.2d 691.

App 213, ¶15, 277 Wis. 2d 243, 689 N.W.2d 684. Thus, we conclude that the trial court did not err in admitting the recorded jail calls.

¶32 Moreover, even if the trial court erred, any error was harmless. For an error to be harmless, the State must prove that it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *State v. Martin*, 2012 WI 96, ¶45, 343 Wis. 2d 278, 816 N.W.2d 270 (citation omitted). As the State observes, the evidence at trial was "overwhelming."

¶33 Outside of the jail calls, the evidence at trial included witness testimony that the shooter wore a distinctive hat, and that after the shooting, two men ran through a gangway. A bag of corner cuts with suspected marijuana was found in the gangway and McCorkle was determined to be the source of DNA on three of the corner cuts. Marlisa, who had dated McCorkle, identified her Impala and McCorkle in a still photo taken from the surveillance footage of the shooting suspects. Marlisa also testified that McCorkle owned a "fisher hat" with a "black string." Likewise, Delrow, who gave McCorkle a ride to New London, testified that he had seen McCorkle wearing a "fishing hat." In addition, Detective Kopcha testified that McCorkle's shoes at the time of his arrest were "consistent" with the shoes in the surveillance video. Therefore, we conclude that even if the jail calls were not admitted, a rational jury still would have convicted McCorkle based on the strength of the other evidence.

### III. Conn's statements in the criminal complaint against Harris

¶34 McCorkle argues that the trial court erred when it admitted Conn's statements in the criminal complaint against Harris. We disagree. As stated above, hearsay is a statement that is offered to "prove the truth of the matter asserted." WIS. STAT. § 908.01(3). Here, the evidence was not offered for the

truth of the matter. As the trial court found, McCorkle's case was not about whether Harris shot Conn. At issue was whether McCorkle shot Conn.

¶35 Moreover, at the request of the defense, the trial court instructed the jury that:

> The allegations of Richard Conn that he was previously shot at by Hakeem Harris were not admitted for the truth of the matter asserted but only to show that such statements were made to the detective.
>
> You should only consider this evidence in deciding whether Richard Conn was a witness in a criminal proceeding.

Jurors are presumed to follow the court's instructions. *See* *State v. Truax*, 151 Wis. 2d 354, 362, 444 N.W.2d 432 (Ct. App. 1989).

¶36 In addition, McCorkle argues that the trial court failed to adequately address his Sixth Amendment Confrontation Clause claim. However, the Confrontation Clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted. *See* *State v. Hanson*, 2019 WI 63, ¶19, 387 Wis. 2d 233, 928 N.W.2d 607.[9] Therefore, we do not discern any trial court error in admitting Conn's statements in the criminal complaint against Harris.

---

[9] In the alternative, the State argues that McCorkle forfeited his right to confront Conn. Because we conclude that the Confrontation Clause does not apply here, we decline to address this argument. *See* *State v. Blalock*, 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989) ("[C]ases should be decided on the narrowest possible ground[.]").

12

## IV. Cumulative error

¶37    Finally, McCorkle argues that the multiple errors in his case cumulatively deprived him of a fair trial.  *See **United States v. Rogers***, 89 F.3d 1326, 1338 (7th Cir. 1996).  However, because we have concluded that the trial court's admission of the challenged evidence was not erroneous, and that in regards to the jails calls, any error was harmless, we reject this argument.

¶38    Therefore, for all of the reasons stated above, we deny McCorkle's request to vacate his conviction and remand for a new trial.

*By the Court.*—Judgment affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)5.