# STATE OF CONNECTICUT *v.* JOSEPH PARE
## (SC 15931)

McDonald, C. J., and Borden, Katz, Sullivan and Vertefeuille, Js.

Argued March 14—officially released July 11, 2000

*Martin Zeldis*, senior assistant public defender, with whom, on the brief, was *Neal Cone*, assistant public defender, for the appellant (defendant).

*Denise B. Smoker*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Gary Nicholson*, senior assistant state's attorney, for the appellee (state).

*Opinion*

KATZ, J. The defendant, Joseph Pare, was convicted, after a jury trial, of the crime of murder in violation of General Statutes § 53a-54a.[1] Following two days of deliberations, the jury returned a guilty verdict and, in accordance with the trial court's instructions, retired to the jury room to await the judge's arrival so that he could speak with them further. Despite the defendant's request to recall the jury to conduct a poll pursuant to Practice Book § 42-31,[2] the trial court declined, and

[1] General Statutes § 53a-54a provides: "Murder. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a) of this section, on the question of whether the defendant acted with intent to cause the death of another person.

"(c) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony or murder under section 53a-54d."

[2] Practice Book § 42-31 provides: "After a verdict has been returned and before the jury have been discharged, the jury shall be polled at the request of any party or upon the judicial authority's own motion. The poll shall be conducted by the clerk of the court by asking each juror individually whether the verdict announced is such juror's verdict. If upon the poll there is

rendered judgment consistent with the verdict. This appeal followed.

This appeal raises several issues. The defendant claims that compliance with § 42-31 is mandatory, and that his request to poll the jury was timely. The defendant further claims that the trial court's failure to honor that request constituted a violation of § 42-31 that is not subject to harmless error analysis. Therefore, we first must determine whether § 42-31 imposes a mandatory obligation upon the trial court to conduct an individual poll of the jury upon a timely request by either party. Second, we must determine when a jury is "discharged" for the purposes of § 42-31, such that a party effectively waives the right to poll by failing to submit a proper request prior thereto. Finally, we must determine whether a violation of § 42-31 is subject to harmless error analysis. On the basis of our determinations regarding these questions, we reverse the judgment and remand the case for a new trial.

The jury reasonably could have found the following facts. In April, 1996, the defendant began living with Michelle Devine shortly after the two had met at an outpatient group therapy session. The defendant suffered from a history of psychiatric problems, including depression, drug addiction and alcohol abuse. Devine also suffered from psychiatric problems and alcohol abuse. From the beginning of the couple's relationship, Devine's excessive drinking was a source of contention that became the subject of frequent arguments. In an effort to keep Devine from drinking, the defendant would often hide alcohol from her, give it away, or pour it out. He would also urge her to seek treatment from a local Alcoholics Anonymous group.

During the summer of 1996, the couple's relationship continued to deteriorate. By that time, the defendant,

not unanimous concurrence, the jury may be directed to retire for further deliberations or they may be discharged."

who had been sober for several months, went back to using drugs. He was eventually admitted to the Yale Psychiatric Institute for depression, suicidal ideation and a nervous disorder. After being released, he continued to receive outpatient medication, and attended Narcotics Anonymous meetings and weekly group therapy sessions. At the same time, Devine's alcohol consumption increased to the point where she was drinking on a daily basis. She withdrew from her outpatient counseling program in July, 1996, and refused to seek alternative treatment.

On September 9, 1996, while the defendant was at work, Devine and a neighbor, Audrey Valentin, engaged in a drinking binge at home. When the defendant returned home, he found Devine and Valentin intoxicated, and a large bottle of vodka on the kitchen table. The defendant became upset and left the apartment. Valentin returned to her apartment upstairs. When the defendant returned about one hour later, Devine was still intoxicated. He and Devine drank beer, and eventually engaged in sexual intercourse. Thereafter, Devine fell asleep, and the defendant retired to the living room to watch television.

Devine awoke around 10 p.m., calling for the defendant and looking for the vodka that, by that time, the defendant had hidden. Following a heated argument, the defendant returned the vodka to Devine. Devine immediately began to consume the alcohol, at which point the defendant knocked the drinking glass from her hand. The defendant then took the vodka bottle from Devine, at which time she grabbed for him, screaming that she was not going to allow him to dump the alcohol. Devine began pulling the defendant's hair, grabbing his arms, and punching him, all in an attempt to retrieve the alcohol. The defendant grabbed Devine by the neck and began choking her. When he released her, she grabbed her bathrobe belt, wrapped it around

her own neck, and threatened to kill herself. At that point, the defendant grabbed the belt and pulled it tightly around Devine's neck until she fell to the floor, dead from strangulation. He then carried Devine's body to the bedroom, covered her with blankets, and put a pillow under her head.

After remaining in the living room for approximately one hour, the defendant left the apartment in search of drugs. When he returned around 2 a.m., he found Devine unresponsive and lying in the same position as when he had left her. It was then that he noticed the ligature marks around her neck and realized that she was either dead or seriously injured. Approximately two hours later, the defendant left the apartment to go to the New Haven police department. Upon arriving at the station, he was crying, upset and visibly distraught. He told the desk sergeant that he had never hurt a woman before, but that he had just "choked the shit out of [his girlfriend]." Thereafter, the defendant was escorted to an interview room where he signed a consent to search form, and a waiver of his *Miranda*[3] rights. He then gave a formal statement in which he confessed to having strangled Devine.

Pursuant to the consent and the information given to them by the defendant, detectives searched the defendant's apartment and found Devine's body lying in the bed where the defendant had left her. There was no sign of a struggle in the apartment and the only visible injuries on Devine's body were red markings around her neck and a small bruise on her upper left arm. The detectives seized a maroon bathrobe belt from near Devine's body. A subsequent autopsy indicated that the markings on Devine's neck were ligature markings, and that the cause of death was strangulation. It

[3] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

also revealed that Devine's blood alcohol level at the time of her death was 0.13, the equivalent of having digested six alcoholic drinks in the previous hour.

At the close of the trial, the court instructed the jury at length, enumerating seven possible verdicts that might be returned. The court also instructed the jury on the defense of extreme emotional disturbance. During the course of its deliberations, the jury requested a number of readbacks of trial testimony and instructions by the court, including a request pertaining to the definition of extreme emotional disturbance. The jury also sought clarification on the effect of its inability to reach a unanimous verdict on the defense of extreme emotional disturbance, questioning whether, under that circumstance, the jury becomes deadlocked or the verdict reverts to murder. Finally, following a statement by the jury that it could not agree on whether the defendant had proven extreme emotional disturbance, the court read a "Chip Smith" instruction[4] and ordered the jury to continue deliberating.

---

[4] "A 'Chip Smith' instruction reminds the jurors that they must act unanimously, while also encouraging a deadlocked jury to reach unanimity. See *State* v. *Smith*, 49 Conn. 376 (1881); see also 5 Connecticut Practice, D. Borden & L. Orland, Connecticut Criminal Jury Instructions (1986) § 4.8." *State* v. *Tomasko*, 242 Conn. 505, 508 n.6, 700 A.2d 28 (1997). The trial court gave the following Chip Smith instruction: "I have a note. 'We are not unanimous on the [extreme emotional disturbance] defense, can you instruct us further?' Yes, I can. And this instruction hopefully will help you. I feel that the case has been well tried. You have heard the evidence and I am of the opinion that I should give you additional instructions regarding this matter to see whether or not it's within your reach to arrive at a verdict in the case. So, with this thought in mind, I wish to state to you at the outset that the additional instructions are not to be construed by you to be coercive in any manner or to compel you to arrive at a verdict. The instructions are designed to aid you in considering your own positions individually and weighing your individual positions against the collective position or positions of other members of the jury, and after having done so, to reconsider whatever conclusions that you individually may have reached, not to suggest to you in any manner that you are compelled to reach a verdict or must reach a verdict. . . .

"The instructions that I shall give you now are only to provide you with additional information so that you may return to your deliberations and see

Soon thereafter, the jury announced that it had reached a verdict. At that point, defense counsel requested a sidebar with the trial court, which was conducted off the record. Following the sidebar, the jury was escorted into the courtroom to announce the verdict. The jury found the defendant guilty of murder. The clerk then asked the jury collectively whether "each of you do say unanimously that the defendant is guilty of the crime of murder, this is your verdict and so say you all?" The jury collectively responded, "[y]es." The court then addressed the jury by questioning both the unanimity of the verdict, and the process that they had followed in reaching it. The court explained that "because there were so many verdicts and to avoid any question in the future, I'll just review the process that you necessarily would have had to have gone through to reach this verdict.[5] This verdict, I'll ask if you agree

whether you can arrive at a verdict. And along these lines, I would like to state the following to you.

"Although the verdict to which each of you agrees must express your own conclusion and not a mere acquiescence in the conclusion of your fellow jurors, yet, in order to bring your minds to a unanimous result, you should consider the question you have to decide not only carefully but also with due regard and deference to the opinions of each other.

"In conferring together you ought to pay proper respect to each other's opinions and listen with an open mind to each other's argument. If much the larger number of you reach a certain conclusion, a dissenting juror or jurors should consider whether his opinion is a reasonable one when the evidence does not lend itself to a similar result in the minds of so many of you who are equally honest and equally intelligent with yourself, who have heard the same evidence with the same attention with equal desire to arrive at the truth and under the same sanction of the same oath.

"If the majority of you are for one decision, the minority ought seriously to ask themselves whether in reason they should adhere to their own conclusions when those conclusions are not concurred in by most of those with whom they are associated, and whether it might not be well to distrust the weight or sufficiency of the evidence upon which they rely, when it fails to bring the minds of their fellow jurors to the same conclusion that you hold.

"I have stated this to you in order to get you to further consider in your deliberations the opinions of your fellow jurors, this is all. I'm going to ask you to return to the jury room and see if you can arrive at a verdict."

[5] Regarding the order of charges that the jury should consider, the trial court instructed as follows: "The first thing you have to do is consider

on. This verdict means that you found the defendant

murder. . . . [I]f you find the defendant guilty of murder beyond a reasonable doubt . . . you go on to consider the defense of extreme emotional disturbance, and I'll explain to you what that defense is, and it has to be proven by a preponderance of the evidence and that's the defendant's burden to prove that. If they don't prove that defense, then you would—if they do prove the defense, then the defendant is guilty of manslaughter . . . . If they don't prove—if the defense—if they fall short of proving the defense by a preponderance of the evidence, you've already found the defendant guilty of murder, you've considered the extreme emotional disturbance defense, it has not persuaded you to the standard that's required, your verdict would be guilty of murder. . . .

"Now, like I said, the first question that you must—the first question with regard to the charges that you must decide is whether the defendant is guilty or not guilty of murder. You can see that the second longer chart [that I have handed you] deals with if you found the defendant not guilty of murder. It says if not guilty of murder, then you would consider these two other different manslaughter verdicts. One, where the mental element is the intent to cause serious physical injury or manslaughter in the first degree where the mental element is extreme indifference to human life.

"If you found the defendant guilty—you could not find the defendant guilty of both of these, it's one or the other or neither, but not both, and you can't add up a total to make twelve, you can't have seven for guilty of manslaughter extreme indifference and five for guilty of manslaughter serious physical injury.

"In order to obtain a conviction after a finding of not guilty on murder to one of these counts of manslaughter in the first degree, you would have to have a unanimous verdict and the elements would have to be—all the elements of either one would have to be proven beyond a reasonable doubt. . . .

"If you find the defendant not guilty of murder and not guilty of both manslaughter in the first degree, then you would go on to consider manslaughter in the second degree. And you can see that there's a different mental element there. If you found the defendant guilty at any point here, you can see that you would stop and that would be your verdict, you don't go on to consider these lesser included offenses, and you can see the word stop after manslaughter first, stop after manslaughter first extreme indifference to human life.

"Once you reach a guilty verdict, you stop, but if you find the defendant not guilty, you go on to manslaughter in the second degree. If you found the defendant not guilty of that charge, if you found him not guilty, you would go on to consider criminally negligent homicide. If you found the defendant guilty of manslaughter in the second degree, you would stop and that would be your verdict all the way down. If you found the defendant not guilty of criminally negligent homicide, then you would have found him not guilty of murder and all the lesser included offenses. . . . And those

guilty of intentionally causing the death of Michelle Devine, then you went on to consider the affirmative defense of extreme emotional disturbance and found unanimously that the defendant had not proven that defense by a preponderance of the evidence, is that correct?" The jury collectively responded, "[y]es." The court continued that "[t]he record can reflect that the entire jury nodded in agreement with that statement and also answered orally to that question and the result was that you unanimously agree that the defendant is guilty of murder?" Again, the jury responded, "[y]es." The court then stated: "All right. Once again, the same can be noted for the record, the agreement of the jury both orally and by nodding affirmatively. The jury can retire now and if you wait for a moment, I'll be in to speak to you very shortly."

Immediately after the jury exited the courtroom, defense counsel addressed the court by stating that, "[a]long the lines of the request that I made at the bench, I do understand that Your Honor spoke to them as a group, but basically I would be asking for those questions to be asked to each juror individually and that Your Honor poll every one of them." The court denied this request and ruled as follows: "I was looking right at the jury and I know you're doing what you think is necessary to protect your client's rights, but I was look-

---

possibilities amount to seven possibilities, which the clerk is going to give you. . . .

"The possible verdicts in the case are guilty of murder, guilty of manslaughter in the first degree—if you found the defendant guilty of murder then went on to consider his defense and found it proven by a preponderance of the evidence, that would result in a verdict of guilty of manslaughter in the first degree and what we call EED, extreme emotional disturbance. If you found the defendant not guilty of murder, then you would go on to consider three and four, which are other types of manslaughter in the first degree. If you found the defendant not guilty of those, then you would go on to consider manslaughter in the second degree. . . . And if you found the defendant not guilty of murder and all the lesser charges, that would be another verdict. Those are the possible verdicts."

ing right at the jury, they all nodded and answered yes to my questions, so I'll deny your request."

The court rendered judgment in accordance with the verdict. The defendant appealed from the judgment of the trial court to the Appellate Court. Thereafter, we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

The defendant claims on appeal that (1) pursuant to § 42-31, the trial court improperly declined to poll the jury following a timely request by defense counsel, and (2) this impropriety is not subject to harmless error analysis. As to the defendant's first claim, we conclude that the trial court's obligation to conduct a poll under § 42-31 is mandatory. We conclude further that defense counsel's polling request in this case was timely and, therefore, the trial court violated § 42-31 by failing to recall the jury to conduct a poll after it had departed from the courtroom. As to the defendant's second claim, we conclude that a violation of § 42-31 is not subject to harmless error analysis but, rather, requires automatic reversal of the defendant's conviction. Accordingly, we reverse the trial court's judgment and remand the case for a new trial.[6]

I

The defendant first claims that the trial court violated § 42-31 by denying his request to poll the members of the jury individually. The defendant maintains that the mandatory language of the rule is unambiguous and, therefore, the trial judge is required to conduct a poll upon a timely request by either party. According to the defendant, defense counsel satisfied the timeliness requirements of § 42-31 by submitting a request to poll

[6] The defendant raises an additional issue on appeal, namely, that the trial court's instructions on reasonable doubt were improper. In light of the conclusion reached herein, we do not reach the merits of that third claim.

prior to the jury's discharge, that is, prior to the separation and dispersal of the individual members of the jury.

The state, on the other hand, contends that a jury is discharged within the meaning of § 42-31 once it departs from the courtroom. Thus, the state maintains that even if the trial court's obligation to poll the jury under § 42-31 is mandatory in nature, defense counsel effectively waived the right to poll by failing to submit a timely request prior to the jury's discharge.

We conclude that, pursuant to § 42-31, a trial court's obligation to poll the jury upon a timely request from either party is mandatory. We conclude further that a jury is not discharged for the purpose of § 42-31 until its individual members separate or disperse and, therefore, a request submitted prior thereto is timely. Accordingly, under the circumstances of this case, defense counsel's request was timely, and the trial court violated § 42-31 by failing to recall the jury for the purposes of conducting a poll.

A

Our analysis of the defendant's first claim is guided by well established principles of statutory construction. "Statutory construction is a question of law and therefore our review is plenary. *Davis* v. *Norwich*, 232 Conn. 311, 317, 654 A.2d 1221 (1995). [O]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . *Connecticut National Bank* v. *Giacomi*, 242 Conn. 17, 32, 699 A.2d 101 (1997)." (Citations omitted; internal quotation marks omitted.)

*Rivera* v. *Double A Transportation, Inc.*, 248 Conn. 21, 25, 727 A.2d 204 (1999).

These principles of statutory construction apply "with equal force to Practice Book rules. *Grievance Committee* v. *Trantolo*, 192 Conn. 15, 22, 470 A.2d 228 (1984)." (Internal quotation marks omitted.) *Pitchell* v. *Hartford*, 247 Conn. 422, 432, 722 A.2d 797 (1999). With respect to the interpretation of § 42-31 particularly, our analysis is guided by an additional maxim of construction. As with any criminal provision, rules of criminal practice "are not to be read more broadly than their language plainly requires and ambiguities are ordinarily to be resolved in favor of the defendant. . . . *State* v. *Jones*, 234 Conn. 324, 340, 662 A.2d 1199 (1995). . . . [U]nless a contrary interpretation would frustrate an evident legislative intent, [rules of criminal procedure] are governed by the fundamental principle that such [rules] are strictly construed against the state. *State* v. *Ross*, 230 Conn. 183, 200, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995)." (Internal quotation marks omitted.) *State* v. *Dash*, 242 Conn. 143, 147, 698 A.2d 297 (1997); see also *State* v. *Angell*, 237 Conn. 321, 327, 677 A.2d 912 (1996).

In this case, we must determine whether the term "shall," as used in § 42-31, implicates a mandatory obligation, or is directory in nature. "The task of determining whether a particular provision is mandatory or directory involves the same criteria, namely, the statute's language, the legislative history and the statutory context." *Angelsea Productions, Inc.* v. *Commission on Human Rights & Opportunities*, 236 Conn. 681, 689, 674 A.2d 1300 (1996). The test to be applied "in determining whether a [rule] is mandatory or directory is whether the prescribed mode of action is the essence of the thing to be accomplished, or in other words, whether it relates to a matter of substance or a matter of convenience. . . . If it is a matter of substance,

the statutory provision is mandatory. If, however, the legislative provision is designed to secure order, system and dispatch in the proceedings, it is generally held to be directory, especially where the requirement is stated in affirmative terms unaccompanied by negative words. . . . *Stewart* v. *Tunxis Service Center*, 237 Conn. 71, 76–77, 676 A.2d 819 (1996)." (Internal quotation marks omitted.) *Doe* v. *Statewide Grievance Committee*, 240 Conn. 671, 680–81, 694 A.2d 1218 (1997).

Looking first at the words of § 42-31, it would appear that the language requires a trial court to conduct a poll pursuant to a timely request. As stated previously, the rule of practice provides: "After a verdict has been returned and before the jury have been discharged, the jury *shall* be polled at the request of any party . . . ." (Emphasis added.) Practice Book § 42-31. "Definitive words, such as must or shall, ordinarily express legislative mandates of a nondirectory nature. *State* v. *Metz*, 230 Conn. 400, 410, 645 A.2d 965 (1994); *Lo Sacco* v. *Young*, 210 Conn. 503, 507, 555 A.2d 986 (1989) . . . . We have noted, however, that the use of the word shall, though significant, does not invariably establish a mandatory duty. . . . *Angelsea Productions, Inc.* v. *Commission on Human Rights & Opportunities*, [supra, 236 Conn. 690]." (Citations omitted; internal quotation marks omitted.) *Doe* v. *Statewide Grievance Committee*, supra, 240 Conn. 681. Therefore, we turn to the other aforementioned considerations in deciding whether § 42-31 imposes a nondiscretionary obligation.

The right to poll the jury, although not of constitutional dimension, is nonetheless "a corollary to the defendant's right to a unanimous verdict." *State* v. *Behnke*, 155 Wis. 2d 796, 801, 456 N.W.2d 610 (1990); see also *State* v. *Pockert*, 49 Wash. App. 859, 862, 746 P.2d 839 (1987), review denied, 110 Wash. 2d 1018 (1988) ("[t]he right to have each juror individually state his or her verdict in his presence is essential to a criminal

defendant's constitutional right to a unanimous verdict"). Consequently, as a mechanism for preserving an essential characteristic of both the state and federal constitutions; see *Burch* v. *Louisiana*, 441 U.S. 130, 138, 99 S. Ct. 1623, 60 L. Ed. 2d 96 (1979) (right to unanimous verdict rendered by six person jury protected under right to jury trial guaranteed by due process clause of fourteenth amendment to United States constitution); *State* v. *Jennings*, 216 Conn. 647, 656, 583 A.2d 915 (1990) (acknowledging right to unanimous verdict protected by article first, § 8, of Connecticut constitution); the trial court's obligation to conduct a jury poll pursuant to a valid request cannot reasonably be characterized as a mere procedural formality.

That the word "shall" as used in § 42-31 is mandatory in nature is buttressed by the history of that rule. Prior to October 1, 1995, Practice Book § 869, the precursor to § 42-31, provided in relevant part as follows: "After a verdict has been returned and before the jury have been discharged, the jury *may* be polled at the request of any party or upon the judicial authority's own motion. . . ." (Emphasis added.) Pursuant to that rule, this court consistently had held that whether to grant a request to poll the jury rested in the sound discretion of the trial court. See, e.g., *State* v. *Tirado*, 194 Conn. 89, 95, 478 A.2d 606 (1984); *State* v. *Tucker*, 181 Conn. 406, 420, 435 A.2d 986 (1980); *State* v. *Chetcuti*, 173 Conn. 165, 172, 377 A.2d 263 (1977); *State* v. *Marshall*, 166 Conn. 593, 598, 353 A.2d 756 (1974); *State* v. *Shelton*, 160 Conn. 360, 363–65, 278 A.2d 782 (1971); *State* v. *Tucker*, 146 Conn. 410, 415, 151 A.2d 876 (1959).

In 1995, the judges of the Superior Court amended § 869 by substituting the term "shall" for the term "may." That change was based on rule 31 (d) of the Federal Rules of Criminal Procedure, which then provided that, upon a timely request by counsel, "the jury *shall* be polled at the request of any party or upon the

court's own motion." (Emphasis added.) See L. Orland & D. Borden, 4 Connecticut Practice Series: Criminal Procedure (3d Ed. 1999) § 42-31, comments, p. 447. Federal courts consistently and without exception have affirmed the mandatory nature of rule 31 (d). See, e.g., *United States* v. *F.J. Vollmer & Co.*, 1 F.3d 1511, 1522 (7th Cir. 1993), cert. denied, 510 U.S. 1043, 114 S. Ct. 688, 126 L. Ed. 2d 655 (1994); *Government of the Virgin Islands* v. *Hercules*, 875 F.2d 414, 419 (3d Cir. 1989); *United States* v. *Morris*, 612 F.2d 483, 489 n.10 (10th Cir. 1979).

On the basis of the language, purpose and history of § 42-31, we conclude that the term "shall," as used in that rule of practice, constitutes a mandatory term. Accordingly, a trial court is required to conduct an individual poll of the jury pursuant to a timely request by either party. The failure to do so constitutes a violation of § 42-31.

### B

We must next determine whether, under the facts of this case, defense counsel's request to poll the jury was timely.[7] The state argues that the defendant effectively waived his right to a jury poll by failing to make a valid request, as required by § 42-31, "[a]fter the verdict ha[d] been returned and before the jury [had] been discharged." In this respect, the state argues that defense counsel's request to poll was ineffective because it was made after the jury had departed from the courtroom

---

[7] The defendant claims that the trial court declined to poll the jury, not based on the timeliness of defense counsel's request, but, rather, based upon the court's misunderstanding that the decision to conduct a poll under § 42-31 was within its discretion. Therefore, the defendant contends that the sole issue in this regard is whether § 42-31 makes an individual poll of the jury mandatory upon request. While at oral argument before this court, the state acknowledged that the trial court denied defense counsel's request based upon the court's failure properly to construe § 42-31, the state, nonetheless, raises the issue of timeliness as an alternative ground for affirmance.

and, therefore, after the jury had been discharged within the meaning of § 42-31. The defendant, on the other hand, maintains that under § 42-31, the jury is not discharged until its members actually separate or disperse. Therefore, he contends that because his request had been made prior to the jury being discharged, it complied with § 42-31.[8] We agree with the defendant.

A request to poll the jury pursuant to § 42-31 must be made in a timely fashion. It is well established that

[8] The defendant contends that, even if his request was not timely because it was submitted after the jury had departed from the courtroom, a previous polling request had been made during defense counsel's sidebar discussion with the court. In response, the state argues that the record is ambiguous as to the substance of the sidebar discussion. The state further contends that, in any event, because a timely request under § 42-31 must be made "[a]fter the verdict has been returned and before the jury has been discharged," any request that defense counsel might have submitted at the bench during the sidebar was premature.

We read the record regarding the earlier sidebar discussion differently than does the state. Following the announcement of the verdict, the trial court twice questioned the jury collectively on its assent to the verdict, asking specifically whether it "found unanimously that the defendant had not proven [the defense of extreme emotional disturbance] by a preponderance of the evidence," and whether it understood that an affirmative response to that question confirmed that "you unanimously agree that the defendant is guilty of murder?" In indicating his dissatisfaction with the specificity of those questions, defense counsel expressly referred to a previous request, clarifying that, "[a]long the lines of the request [he] made at [sidebar]," he was asking the court to conduct an "individual," rather than a collective inquiry. The trial court denied that request, reasoning that, in conducting the inquiry, "I was looking right at the jury, they all nodded and answered yes to my questions . . . ."

We conclude that the record is sufficiently clear that, in submitting a polling request after the verdict had been returned, the defendant was reiterating an earlier polling request, made at the sidebar conference, for the jury to be questioned individually. It is apparent from the trial court's response that it understood the motion to be a reassertion of an earlier request, and that the issue of timeliness was irrelevant to its refusal to poll the jury members individually.

Additionally, contrary to the state's assertion, § 42-31 does not preclude a party from asserting a valid polling request prior to the return of the verdict. As we indicate herein; see part I B of this opinion; the interval between the return of the verdict and the discharge of the jury pertains to the timing of the trial court's inquiry, not the timing of a party's request to poll.

"[t]he right to have the jury polled may be waived. Failure to make a timely demand or request for a poll, where there has been reasonable opportunity to do so, operates as a waiver of the right." 21 Am. Jur. 2d, Criminal Law § 1302 (1998); see, e.g., *State* v. *Lopez*, 52 Conn. App. 176, 181–82, 726 A.2d 620, cert. denied, 248 Conn. 917, 734 A.2d 568 (1999) (right to poll not timely when request made after discharge of jury); *People* v. *Abel*, 166 App. Div. 2d 841, 842, 563 N.Y.S.2d 531, appeal denied, 76 N.Y.2d 983, 565 N.E.2d 521, 563 N.Y.S.2d 772 (1990) (request to poll properly denied where jury had already been excused).

In determining the criteria for timeliness under § 42-31, we again are guided by the aforementioned principles of statutory construction. Section 42-31 provides that the jury shall be polled "[a]fter a verdict has been returned and before the jury have been discharged . . . ." That clause immediately precedes the directive that "the jury shall be polled [by the court] at the request of any party . . . ." Practice Book § 42-31. When the rule is read in its entirety, therefore, it becomes clear that the period between the return of the verdict and the jury's discharge, as contemplated by the rule, pertains to the timing of the jury poll itself, rather than the timing of a party's request for a poll. Finally, we see no reason, either in the language or the history of § 42-31, to preclude a party from giving the trial court advance notice of a request for an individual poll by making such a request while the jury is deliberating and when, as in this case, it becomes apparent that it is about to render its verdict. Indeed, we find nothing in the language of § 42-31 or its legislative history that dictates when a

---

In either event, because the parties agree that the defendant's second request was a specific request to poll pursuant to the provisions of § 42-31, and dispute only the timeliness of that request, we address only whether a request to poll, submitted after the jury has departed from the courtroom, is timely. We, therefore, need not address whether the earlier request, standing alone, without the subsequent renewal, would have been sufficient.

party must submit a request to poll. It logically follows, however, that if the trial court must conduct the poll after the verdict is returned but before the jury is discharged, then a request to poll necessarily must be made prior to the expiration of that period.

Section 42-31 does not define the term "discharge." Nor is that term defined in any other section of the Practice Book.[9] It is appropriate, therefore, that we construe the term discharge in a manner that is consistent with its commonly approved meaning. See *State* v. *Angell*, supra, 237 Conn. 327; see also *State* v. *Salmon*, 250 Conn. 147, 154, 735 A.2d 333 (1999) (discerning technical meaning of "party" from Black's Law Dictionary); *Lo Sacco* v. *Young*, supra, 210 Conn. 507 (resorting to dictionary definition of "must" as used in former Practice Book § 320, now § 16-35). Discharge is defined as "[t]he relieving of a witness, juror, or jury from further responsibilities in a case." Black's Law Dictionary (7th Ed. 1999). According to that definition, a jury cannot be considered discharged so long as its members have yet to fulfill an outstanding obligation pursuant to their status as jurors.

The state acknowledges that the criterion for a jury's discharge is the complete fulfillment of its duties, but argues that the jury in this case fulfilled its duties "once the foreperson announced the guilty verdict, each of the twelve jurors assented three times to that verdict in open court and the jury retired to the jury room to await the judge's remarks." Contrary to the state's assertion, however, a jury is not necessarily relieved of its obligations once it retires from the courtroom. The very existence of a rule for polling a jury, and the atten-

---

[9] We acknowledge that, pursuant to Practice Book § 42-32, the trial judge is under an affirmative obligation to "discharge the jury after they have rendered their verdict . . . ." Although that rule of practice dictates that the jury cannot be discharged until some point after the verdict is rendered, it does not articulate an event that effectively triggers the jury's discharge.

dant authority of the trial court to recall a jury for the purpose of conducting a poll, belies that conclusion. See, e.g., *Mallinson* v. *Black*, 41 Conn. App. 373, 378, 675 A.2d 937 (1996) (relying on result of poll conducted upon recall of jury to determine whether trial court correctly directed verdict in favor of defendant). Particularly when, as here, the trial court effectively informs the members of the jury that, upon departing from the courtroom, they nonetheless remain under the supervisory authority of the trial court, it cannot be said that the jury is discharged under the common understanding of that term.

That the members of a jury are not necessarily relieved of their judicial obligations and, therefore, are not discharged, upon their departure from the courtroom, however, does not end our inquiry. We must determine when the obligations accompanying jury service are deemed complete, thereby triggering the jury's discharge under § 42-31.

In the context of interpreting various polling statutes, other courts agree that a trial court's obligation to poll a jury remains viable until the jury has been discharged. See, e.g., *United States* v. *Marinari*, 32 F.3d 1209, 1214 (7th Cir. 1994) (poll can be conducted under federal rule "[u]ntil the jury is actually discharged by separating or dispersing"); *Rinker* v. *State*, 228 Ga. App. 767, 768, 492 S.E.2d 746 (1997) (common-law right to poll remained viable where "jury had not yet been discharged"); *State* v. *Froneberger*, 55 N.C. App. 148, 155, 285 S.E.2d 119 (1981), cert. denied, 305 N.C. 398, 290 S.E.2d 367 (1982) ("[d]efense counsel waived his right to request a polling of the jury by not making his request prior to the jury's discharge," pursuant to state statute that required trial court to conduct poll " 'before the jury has dispersed' "). Significantly, these courts also agree that the discharge of a jury is not triggered by

its departure from the courtroom, but, rather, by the separation and dispersal of its individual members.

*Marinari,* for example, involved the application of rule 31 (d) of the Federal Rules of Criminal Procedure, which then provided in relevant part that "[w]hen a verdict is returned and before it is recorded the jury shall be polled at the request of any party or upon the court's own motion. . . ." In that case, the United States Court of Appeals for the Seventh Circuit reversed the defendant's conviction based on the trial court's failure to recall the jury for the purposes of conducting a poll after it had exited the courtroom, but while its members, by happenstance, remained in the jury room as a collective unit. *United States* v. *Marinari,* supra, 32 F.3d 1215. Noting that the timeliness of a party's request to poll under rule 31 (d), and thus, the ·trial court's obligation to conduct a poll, turns on whether the verdict has been "recorded," the court held that "the verdict becomes final and unalterable and is therefore 'recorded' when the jury has dispersed, completing its discharge." Id., 1213; see also *Commonwealth* v. *Downey,* 557 Pa. 154, 158, 732 A.2d 593 (1999) ("the recording of the verdict does not become unalterable until the opportunity of the jury to correct or alter it has passed with their dispersion" [internal quotation marks omitted]). More specifically, the court in *Marinari* explained that the opportunity to request a valid poll does not expire "[u]ntil the jury is actually discharged by separating or dispersing (not merely being declared discharged) . . . . *Putnam Resources* v. *Pateman,* 958 F.2d 448, 459 (1st Cir. 1992). When a jury remains as an undispersed unit within the control of the court and with no opportunity to mingle with or discuss the case with others, it is undischarged and may be recalled. *Summers* v. *United States,* 11 F.2d 583, 586 (4th Cir.), cert. denied, 271 U.S. 681, 46 S. Ct. 632, 70 L. Ed. 1149 (1926)." *United States* v. *Marinari,*

supra, 1214; see also *Commonwealth* v. *Downey*, supra, 158 (motion to poll " 'is still timely so long as it is made before the jury has dispersed' "); *Rinker* v. *State*, supra, 228 Ga. App. 767 (polling request " 'is not timely made after the jury disperses' ").

On the basis of the facts and circumstances before it, the court in *Marinari* concluded that the jury had not been discharged when the trial court denied defense counsel's polling request and, therefore, the jury could have been recalled for the purpose of inquiring into the unanimity of the verdict. *United States* v. *Marinari*, supra, 32 F.3d 1215. The court acknowledged that, ordinarily, "[t]he completion of the discharge of the jury, with its dispersal and exposure to outside contact, often occurs quickly after it retires from the courtroom." Id. After the verdict was returned, however, "the jury remained sequestered in the jury room awaiting a security escort to the parking lot. The jurors had not dispersed and they remained untainted by any outside contact. During that time, the jury continued to exist as a judicial body under the control of the court. . . . The jury, under the somewhat unusual factual circumstances of [the] case, was available to be recalled and polled. See, e.g., *Putnam Resources* [v. *Pateman*, supra, 958 F.2d 459]; *Brown* v. *Gunter*, 562 F.2d 122, 125 (1st Cir. 1977)." *United States* v. *Marinari*, supra, 1215; see also *Rinker* v. *State*, supra, 228 Ga. App. 768 (polling request improperly denied where judge had not excused jury and members had not dispersed).

Although *Marinari* involved the interpretation of the term "recorded" as used in federal rule 31 (d), we nonetheless consider the court's discussion of a jury discharge instructive. Indeed, we recognize that "the right to poll the jury, although not constitutional, is nonetheless a substantial right"; *United States* v. *Randle*, 966 F.2d 1209, 1214 (7th Cir. 1992); that enables the court " 'to ascertain with certainty that a unanimous verdict

has in fact been recorded and that no juror has been coerced or induced to agree to a verdict to which he [or she] has not fully assented.' " *Government of the Virgin Islands* v. *Hercules*, supra, 875 F.2d 418; see also *United States* v. *Miller*, 59 F.3d 417, 420 (3d Cir. 1995) (poll "discourage[s] post-trial efforts to challenge the verdict on allegations of coercion on the part of some of the jurors"); *United States* v. *Gambino*, 951 F.2d 498, 502 (2d Cir. 1991), cert. denied sub nom. *D'Amico* v. *United States*, 504 U.S. 918, 112 S. Ct. 1962, 118 L. Ed. 2d 563 (1992) (purpose of jury poll is "to [e]nsure that the defendant was convicted by a unanimous verdict"); *Commonwealth* v. *Downey*, supra, 557 Pa. 158 (purpose of poll is to determine definitively " 'whether the jury's verdict reflects the conscience of each of the jurors or whether it was brought about through the coercion or domination of one of them' "); *State* v. *Tennant*, 173 W. Va. 627, 630, 319 S.E.2d 395 (1984) ("chief purpose behind an individual poll of jurors is to enable a juror to express any reservation he may have about the verdict free from the pressure of his fellow jurors"); *State* v. *Coulthard*, 171 Wis. 2d 573, 581, 492 N.W.2d 329 (App. 1992), review denied, 497 N.W.2d 130 (1993) (poll determines whether verdict "was brought about through the coercion or domination of one [juror]" by fellow jurors). For practical reasons, therefore, a trial court should be required to reassemble a jury and conduct a poll only prior to the separation and dispersal of its members. "The reason usually given why it is too late to poll jurors after they have been dispersed is that they may have 'come into contact with outside influences.' 3 ABA Standards for Criminal Justice at 15-148." *State* v. *Coulthard*, supra, 582; see also *People* v. *McNeeley*, 216 Ill. App. 3d 647, 652, 575 N.E.2d 926, appeal denied, 141 Ill. 2d 553, 580 N.E.2d 128 (1991) ("protective shield" removed upon discharge thereby "allowing the jurors to be influenced by

improper outside factors"). Even "[s]imple questions such as '[d]id we do alright?' or '[w]e did the right thing, didn't we?'—responded to either positively or negatively would taint any subsequent poll." *United States* v. *Marinari*, supra, 32 F.3d 1214. Until that time, however, it can be assumed, in the absence of any indication to the contrary, that the deliberative process had not been tainted and, therefore, that the results of a jury poll will provide adequate confirmation as to whether the verdict was reached upon full consensus of the jurors.[10]

These cases reflect the understanding, based on common human experience, that members of a group may react differently when addressed as a group, and when addressed individually. They also reflect the notion that the concept of jury unanimity is sufficiently significant so as to require that, upon request, each juror be required to state his or her verdict in open court—individually—to face the defendant and the state, and confirm, on his or her own, that the collectively reported verdict is truly his or hers.

Following the approach taken by the court in *Marinari*, we take care not to circumscribe unduly a party's ability to test the unanimity of the verdict so long as the jurors remain "unaffected by outside influences . . . ." Id., 1214. Therefore, adhering to our practice

---

[10] The American Bar Association Standards for Criminal Justice, which served as a model for § 869, the precursor to § 42-31, when that provision was originally adopted, refers to the actual dispersal of the jury described in the case law as the point at which the opportunity to conduct a poll expires. See L. Orland & D. Borden, supra, § 42-31, historical note, p. 446. Those standards expressly presently provide that the time for polling the jury extends to the point "before the jury has dispersed . . . ." A.B.A., Standards for Criminal Justice, Discovery and Trial by Jury (3d Ed. 1996) standard 15-5.6. We recognize the difference in terminology between the language used in the standards and that used in § 42-31. In light of the foregoing analysis, however, we do not deem that distinction to be of significance.

of interpreting criminal provisions strictly against the state; see *State* v. *Dash*, supra, 242 Conn. 147; we conclude that a jury is not discharged for the purposes of § 42-31 until its members actually separate or disperse.

## C

Under the circumstances of this case, we conclude that the jury had not been discharged when the trial court denied defense counsel's polling request. Following the announcement of the verdict, the judge expressly instructed the members of the jury to retire to the jury room and await his arrival. There is no indication in the record that the jury disregarded that instruction. To the contrary, while the colloquy between the trial judge and defense counsel was taking place, the jury remained sequestered in the jury room under the effective supervision of the trial court. Thus, when the trial court denied defense counsel's request to poll, "[t]he completion of the discharge of the jury, with its dispersal and exposure to outside contact"; *United States* v. *Marinari*, supra, 32 F.3d 1215; had not yet occurred. "The jurors had not dispersed and they remained untainted by any outside contact. During that time, the jury continued to exist as a judicial body under the control of the court." Id. Moreover, as stated previously, the trial court did not deny the defendant's polling request on the ground that the jury had been discharged. Rather, based on its improper understanding that the obligation to conduct a poll under § 42-31 was discretionary, the trial court denied the defendant's request because it was satisfied that the jury's collective responses sufficed to establish the unanimity of the verdict.[11] Under the circumstances of this case, the jury

[11] The trial court's collective inquiry did not satisfy the dictates of § 42-31. That rule sets forth not only the obligatory requirement that a jury be polled upon a timely request, but also, the procedures by which a poll shall be conducted. "The poll shall be conducted by the clerk of the court by asking each juror individually whether the verdict announced is such juror's verdict." Practice Book § 42-31. The trial court's inquiry here did not comply with that procedure.

had not been discharged pursuant to § 42-31 and, therefore, the trial judge was required to recall the jury for the purposes of conducting an individual poll.[12]

## II

We next address whether a violation of § 42-31 requires that the judgment be reversed. The state argues that, even if the trial court improperly denied defense counsel's polling request, the defendant's conviction should not be reversed absent a showing of harm. In this respect, the state contends that, because the jury failed to repudiate its verdict when the foreperson announced the verdict, when it assented in unison upon the clerk's inquiry, and when it unanimously agreed in response to the court's questioning, the record clearly and unequivocally established that the verdict was unanimous. The defendant maintains, on the other hand, that the denial of a valid polling request is not

---

[12] The state relies heavily on the case of *State* v. *Lopez*, supra, 52 Conn. App. 176, for the proposition that the jury's departure from the courtroom, upon rendering the verdict and assenting to it in open court, signals its discharge. We do not agree.

*Lopez* involved the joint trial of several codefendants charged with various offenses. After the jury had returned a guilty verdict against Lopez, it retired to the jury room to continue deliberations on an additional count against one of his codefendants. Id. Thereafter, the jury was brought back into the courtroom for further instructions on that additional count. It was not until after the court had read those instructions that defense counsel for Lopez requested a poll as to the verdict previously rendered against Lopez. The court denied that request on the ground that it had been made after the jury "had effectively been discharged . . . ." Id., 182.

The facts of *Lopez* are distinguishable from this case. In *Lopez*, the jury had effectively fulfilled its official obligations with respect to Lopez prior to defense counsel's request to poll. All counts against him had been resolved, and the jury's verdict against him had been accepted and recorded by the trial court. Id. Although the jury remained intact for the purposes of resolving the remaining count against the codefendant, its members were technically free of any further obligations with respect to the case against Lopez. Thus, nothing in the Appellate Court's conclusion that the jury in *Lopez* had effectively been discharged for the purposes of § 42-31, when read in light of the unique facts and circumstances of the case, is inconsistent with the definition of discharge we articulate herein.

amenable to harmless error analysis because there is no way to ascertain the effects of a poll not taken and, therefore, a violation of § 42-31 requires a reversal of the defendant's conviction. We agree with the defendant.

Ordinarily, our courts apply a harmless error analysis in determining whether a violation of a rule of practice amounts to reversible error. See, e.g., *State* v. *Siano*, 216 Conn. 273, 281–82, 579 A.2d 79 (1990) (applying harmless error to state's violation of then Practice Book § 744, requiring prosecutor to disclose felony convictions and pending misdemeanor charges of state's witnesses); *State* v. *Quintana*, 209 Conn. 34, 43, 547 A.2d 534 (1988) (same). As stated previously, however, because the purpose of permitting an individual poll is to protect the accused's constitutional right to an acquittal in the absence of the full consensus of each juror, the denial of a timely request to poll is of substantial and unique magnitude. As one court explained, "[t]he action of the court [in denying a timely request to poll the jury] work[s] a denial of a right of the accused so fundamental as to require a retrial even though, as clearly appears from the record, the trial was otherwise markedly free from error and the jury's verdict was fully warranted by the evidence. Yet it is better that the case be tried again than that a precedent impairing a defendant's right to a poll of the jury be engrafted on our criminal procedure." (Internal quotation marks omitted.) *Commonwealth* v. *Downey*, supra, 557 Pa. 159.

As stated previously; see part I A of this opinion; the change in § 42-31, from a discretionary to a mandatory rule, was based on the language of federal rule 31 (d). In affirming the mandatory nature of that rule, federal courts have largely dispensed with an evaluation of harm, opting instead to require reversal regardless of whether the defendant was prejudiced by the trial court's failure to conduct a timely poll. See, e.g., *United*

*States* v. *Marinari,* supra, 32 F.3d 1215 (given defendant's right to poll jury, "it was error per se for the district court not to recall the jury and conduct an oral poll"); *United States* v. *F.J. Vollmer & Co.,* supra, 1 F.3d 1522 ("[f]ailure to poll the jury upon a timely request is 'per se error requiring reversal' "); *United States* v. *Hiland,* 909 F.2d 1114, 1138 (8th Cir. 1990) ("[d]enial of a timely request for a poll under Rule 31 (d) is reversible error"); *Government of the Virgin Islands* v. *Hercules,* supra, 875 F.2d 419 (improper denial of polling request "is per se error requiring reversal of [defendant's] conviction"). The majority of state courts have taken the same approach. *Rinker* v. *State,* supra, 228 Ga. App. 767 (" '[i]n criminal cases the right to poll the jury is not discretionary, and [the] denial of that right when timely requested is reversible error' "); *Commonwealth* v. *Downey,* supra, 557 Pa. 159 ("the denial of one's right to poll the jury dictates that a new trial be awarded"); *State* v. *Pockert,* supra, 49 Wash. App. 862 ("failure to poll the jury 'worked a denial of a right of the accused so fundamental as to require a retrial' "); *State* v. *Behnke,* supra, 155 Wis. 2d 797 (failure to poll jury absent knowing, voluntary and unequivocal waiver "is grounds for automatic reversal").

The state acknowledges the weight of authority from other jurisdictions, but nonetheless proposes that a polling violation is amenable to harmless error review. The essence of the state's argument is that, in the absence of any indication of dissent, the jury's affirmative responses as a body provides a sufficient guarantee of unanimity to render the lack of an individual interrogation harmless.

We disagree with the state's contention that polling violations are amenable to harmless error analysis. Despite the jury's collective assent to the verdict, "absent a poll, a defendant has no way of ensuring that his or her right to a unanimous, uncoerced verdict was

honored." *State* v. *Kircher*, 189 Wis. 2d 392, 400, 525 N.W.2d 788 (1994). "[While] the jury did not behave in any manner to suggest that polling would have produced a juror who did not support the verdict and thus changed the outcome of the trial, the fact remains that we cannot know the results of polling the jury." *State* v. *Behnke*, supra, 155 Wis. 2d 806–807. "[I]n the absence of a valid poll upon a timely request, we must regard the verdict as defective." *Government of the Virgin Islands* v. *Hercules*, supra, 875 F.2d 419.

The state offers no persuasive reason for departing from the near uniform practice of requiring automatic reversal whenever a trial court improperly denies a party's timely polling request.[13] Thus, we follow the rule of the great majority of jurisdictions "that a defendant's right to poll the jury, if not waived, is absolute, and its

[13] The state suggests that the recent decision of the United State's Supreme Court in *United States* v. *Neder*, 527 U.S. 1, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999), calls into question the propriety of subjecting polling violations to a standard of automatic reversal. We do not agree.

In *Neder*, the defendant had been charged with, inter alia, filing false federal income tax returns, and challenged the trial court's failure to instruct the jury on the element of materiality. Applying harmless error principles to the defendant's claim, the court held that a jury instruction that improperly omits an essential element from the charge constitutes harmless error if a reviewing court "concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error . . . ." Id., 17.

The present case presents an entirely different issue on appeal, namely, whether a violation of a jury polling request is amenable to harmless error analysis. As articulated previously, unlike the trial court's failure to instruct on every element of a crime, there is simply no way of predicting the result of a poll not taken. "Put another way, [the refusal to confirm the unanimity of the verdict via an individual poll of the jury] deprive[s] defendants of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . ." (Internal quotation marks omitted.) Id., 8–9. Consequently, in light of the bulk of authority directly on point, we are not persuaded that *Neder*, by extending harmless error principles to improper jury instructions, applies with equal force to a trial court's decision to deny a proper polling request.

denial requires reversal even though the remainder of the trial may be error-free." *State* v. *Wojlalewicz*, 127 Wis. 2d 344, 346, 379 N.W.2d 338 (App. 1985). We recognize that rarely does an individual poll reveal that a juror assented to a verdict despite reservation regarding the defendant's guilt beyond a reasonable doubt. See *Jaca Hernandez* v. *Delgado*, 375 F.2d 584, 586 (1st Cir. 1967) (not likely "that members of a jury would listen to, or speak collectively in support of, their foreman, and immediately thereafter contradict themselves if asked to speak individually"). Nonetheless, in light of the weighty interest protected by a jury poll, and the impracticality of gauging the results of a poll not taken, we conclude that a violation of a party's timely polling request requires automatic reversal of the judgment.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other justices concurred.