STATE of Wisconsin, Plaintiff-Respondent,

v.

Gregory A. COULTHARD, Defendant-Appellant.†

Court of Appeals

*No. 91–1388–CR. Submitted on briefs February 5, 1992.—Decided October 1, 1992.*

(Also reported in — N.W.2d —.)

† Petition to review denied.

575

For the defendant-appellant the cause was submitted on the brief of *David E. Lehmann* of *Lehmann Law Offices, S.C.* of Madison.

For the plaintiff-respondent the cause was submitted on the brief of *James E. Doyle,* attorney general, with *Maureen McGlynn Flanagan,* assistant attorney general.

Before Eich, C.J., Gartzke, P.J., and Dykman, J.

GARTZKE, P.J. Gregory A. Coulthard appeals from a judgment convicting him of first-degree intentional homicide, sec. 940.01(1), Stats.,[1] following a jury trial in Grant County with jurors from Waukesha County, and from an order denying his post-conviction motion. He contends that (1) the trial court erred when it denied his request to poll the jurors individually, (2) the court violated his right against self-incrimination by admitting his post-arrest statements into evidence, (3) the court violated his constitutional rights by the manner in which it conducted two jury views, (4) the prosecutor made impermissible statements during closing arguments, (5) preparation of a presentence report violated his due process rights, (6) his parole eligibility date must be reset, and (7) the court of appeals should exercise its power under sec. 752.35, Stats., to order a new trial.

---

[1]First-degree intentional homicide is causing the death of another human being with intent to kill that person. Section 940.01(1), Stats.

We conclude that the trial court erred with respect to the jury poll but a later poll rendered the error harmless. We reject his other contentions and affirm.

1. Background

Coulthard, an eighteen-year-old live-in farmhand in rural Grant County, testified that on the night of March 18, 1990, he drove a cab-enclosed tractor from the farm toward Platteville to see a friend, taking with him a .12 gauge shotgun and deer slugs. He could not say why he had the gun with him. At some point he turned around and headed back to the farm. About 11:30 p.m. on the way back, he stopped at a large billboard sign "that had a very bright light on it that had bothered" him because it could be confused with an oncoming vehicle. He loaded his gun with five slugs, got out of the tractor, shot out the light and shot the last four slugs into the back of the sign, reloaded his gun with five more slugs and drove off.

He testified that sometime later he realized that a car was following him even when he turned into a side road. He saw red and blue flashing lights and knew it was a police car, but he did not understand why he was being stopped. He got "very scared and panicky," because he did not want to go back to jail. He had been jailed for thirty days on two counts of criminal damage and one count of theft and had been jailed for drunk driving. Being in jail had been the "worst experience" in his life.

After he stopped the tractor, he decided to jump out with the shotgun and run in the opposite direction from the officer. The shotgun was in a carrying case on the right side of the tractor seat. He moved the gun over to his left side, opened the case, took out the gun, looked up, and saw a flashlight "right outside the door. As soon as I saw the flashlight it startled me and I fired." At one point he testified, "I shot him [the officer] when I saw

him," but later testified he never actually saw the officer. The officer fired three shots.

After ten or fifteen seconds, Coulthard heard no more shots. He left the tractor, ran to his farm, woke up his roommate and asked for his car keys. When the roommate asked why, Coulthard said he had shot a cop. The roommate insisted that Coulthard leave the shotgun behind. They drove off in the friend's car, passed the scene of the shooting, and were soon stopped by a squad car. The friend told the police that "the man you're looking for is right here," pointing to Coulthard. Coulthard was subsequently arrested for having shot and killed Grant County Deputy Sheriff Thomas Reuter.

### 2. Jury Poll

On July 17, 1990, when the jury returned its guilty verdict, the trial court asked the jurors for a collective show of hands "[i]f this is your verdict," and all the jurors raised their hands. Coulthard's counsel asked that they be individually polled, but the court responded that it had just polled them and discharged the jury.[2]

On August 28, 1990, the trial court notified Coulthard and the state that the court had erred by denying Coulthard's request, and a new trial was necessary. However, after conferring with the parties, the court decided to reassemble the jurors to conduct the poll. On September 6, 1990, fifty-one days after the jury had been discharged, and over Coulthard's objection, the jury was individually polled in the manner we shall describe.

Polling the jury is a common law procedure whereby "after verdict each juror is separately asked whether he or she concurs" in the verdict, its purpose being to deter-

---

[2]While counsel did not expressly request an "individual" poll, it is undisputed that he implicitly did so.

mine "before it is too late, whether the jury's verdict reflects the conscience of each of the jurors or whether it was brought about through the coercion or domination of one of them by some of his fellow jurors or resulted from sheer mental or physical exhaustion of a juror." 3 ABA STANDARDS FOR CRIMINAL JUSTICE, ch. 15–4.5 commentary at 15–146 (1980) (quoting *Commonwealth v. Martin,* 102 A.2d 325, 328 (Penn. 1954)).

The trial court unquestionably erred by failing to conduct the individual poll. A defendant has the right, when timely asserted, to have the jurors individually polled on their verdict. *State v. Behnke,* 155 Wis. 2d 796, 801, 456 N.W.2d 610, 612 (1990).

Coulthard asserts that he need not show prejudice to obtain a new trial. He cites *Behnke, Smith v. State,* 51 Wis. 615, 8 N.W. 410 (1881), and *State v. Wojtalewicz,* 127 Wis. 2d 344, 379 N.W.2d 338 (Ct. App. 1985), which treated denial of the right to an individual poll as grounds for automatic reversal, but did not involve polling a reassembled jury after its discharge. The question before us is whether reassembling the jury and conducting an individual poll under the circumstances of this case renders harmless the trial court's initial error of denying the poll.

Whether the right to an individual poll is, as Coulthard describes it, "of constitutional dimension" or, as the *Behnke* court said, "a corollary to the defendant's right to a unanimous verdict,"[3] denial of the right does not necessarily defy analysis under "harmless error" standards. Coulthard had a right to a jury trial, and he received it. The jury returned its verdict, and it was collectively polled. Coulthard was denied his right imme-

---

[3]*Behnke,* 155 Wis. 2d at 801, 456 N.W.2d at 612.

diately to check the unanimity of the verdict through an individual poll, and the court later conducted the poll.

The reason usually given why it is too late to poll jurors after they have been dispersed is that they may have "come into contact with outside influences." 3 ABA STANDARDS FOR CRIMINAL JUSTICE at 15–148. It may be that during the fifty-one days between the collective poll and the individual poll the jurors were subjected to outside influences. We do not know whether that is true. Whether or not it is true, the question remains whether the error was harmless in view of the trial court's curative measures.

We first identify the area of risk resulting from outside influences. The risk is not whether the jurors were subjected to outside influences after they dispersed. The risk is whether outside influences affected their answers when they were individually polled concerning the state of mind of each when the verdict was returned. A juror's change of mind after the verdict was returned is irrelevant. The risk is that one or more of the jurors falsely responded when immediately after they returned the verdict the court asked them for a collective show of hands "[i]f this is your verdict," and because of outside influences again falsely responded when individually polled regarding each juror's state of mind when they reached the verdict.

[2]

Having identified the risk, we apply the harmless error test to assess it. The test asks whether an error, constitutional or otherwise, is such that "there is a reasonable possibility that the error contributed to the conviction. If it did, reversal and a new trial must result." *State v. Dyess,* 124 Wis. 2d 525, 543, 370 N.W.2d 222, 231–32 (1985). We are satisfied beyond a reasonable doubt that, notwithstanding the seriousness of the trial

court's initial error, the curative action it took is such that no reasonable possibility exists that one or more jurors not only falsely responded to the collective poll but also to the individual poll.

The jurors had been chosen from residents of Waukesha County.[4] They were reassembled with no advance notice that they would again be polled. The clerk of court for Grant County gave each juror the following message by telephone:

> Judge Fiedler has decided that the jury must be returned on Thursday, September 6, so that he can ask each member of the jury a question. It is necessary that this be done to complete this case. You will be in Lancaster just a short time. You will be picked up at the Waukesha County Courthouse at 6:30 a.m. and returned in early afternoon. You will be paid your jury fee and lunch will be provided. Please be at the same entrance at the Waukesha Courthouse as you were when you were originally picked up.

The clerk provided no additional information to the jurors.

When all twelve members of the jury were reassembled in the Grant County courtroom, Coulthard was present. The trial court advised the jurors that they had been asked to assemble

> so that a few questions can be asked of you. These questions would normally have been asked when you returned with your verdict but they were not. Therefore in order to complete this case, we have had you brought back to Lancaster so that these questions can be asked of you. I will remind you that you are

---

[4]We merely note the historical fact that the Grant County jury was chosen from Waukesha County residents. That fact does not affect our reasoning.

still members of the jury panel and that you are under the oath that you took in July.

After describing the questions it would ask, the court said,

> Members of the jury, I want you to answer these questions the same way that you would have answered them had they been asked when you immediately returned with your verdict. That is your answers should not be what you might answer today but what you would have answered if asked immediately after you returned with your verdict.

The trial court asked for a show of hands whether the jurors could truthfully answer the same way they would have answered if asked immediately after return of the verdict. All twelve jurors indicated they could do so. The court then again administered the juror's oath to the jurors and then administered to them the oath given to witnesses.

The trial court next re-read the verdict so that all could hear, "We, the jury, find the defendant, Gregory A. Coulthard, guilty of first degree intentional homicide as charged in the information," and followed that reading with a series of questions uniformly addressed to each juror. The questions to each juror were as follows: "Did you hear me read the verdict?" "Do you agree with that verdict?" "Was that your own individual verdict?" "Was that verdict reached by you as a result of your own decision based on the evidence you heard and the court's instructions given to you?" "Did you feel coerced or pressured or forced in any way to reach that verdict?" "Were you convinced of Mr. Coulthard's guilt beyond a reasonable doubt?" Each juror answered in support of the verdict.

The court followed that series of questions with still another question to each individual juror: "Were your answers to my questions based on how you would have answered those questions had you been asked them immediately when you returned with the verdict?" Each juror individually responded affirmatively.

When asked whether they wished to poll the jury, the defendant and the state declined. After excusing the jury, the trial court made findings of fact and conclusions of law.

The court found that at 10:38 a.m. on July 17, 1990, the jury was taken to the jury room to deliberate and they returned their verdict at 1:00 p.m. They had reached their verdict before 1:00 p.m., but it took that long for the court, counsel, and the defendant all to be present. The verdict was orally read by the court in the presence of the jury which was then collectively polled by the court, and all members indicated agreement with the verdict. When the jurors reassembled, their answers to the polling questions were the same as their answers would have been when they returned their verdict. No coercion, pressure or force was exercised on any juror in reaching the verdict, and each individual juror indicated by their answer they felt convinced of Coulthard's guilt beyond a reasonable doubt. Counsel was given the right to individually poll the jury and chose not to do so. The court concluded that Coulthard's right to poll the jury was honored, the fact that the jury was polled seven weeks after the verdict was returned did not violate his right to a unanimous verdict, and the verdict was reached without coercion, force or pressure exercised on any individual juror.

The trial court added that the jurors' answers when reassembled were corroborated by the short time they had deliberated. Because they were not told the reason

for their return to Grant County, they had no chance to formulate answers to anticipated questions. The individual poll was more detailed then would normally be the case. It was more in the nature of a voir dire, and each juror answered the questions without hesitation.

Notwithstanding the trial court's findings and conclusions, it remains our duty as an appellate court to decide whether the court's initial error in denying an individual poll was rendered harmless. Deciding whether an error is harmless—or in this case was rendered harmless—is an appellate function. *Rudolph v. State,* 78 Wis. 2d 435, 447, 254 N.W.2d 471, 476 (1977) (per curiam), *cert. denied,* 435 U.S. 944 (1978).

We are confident that the court's error was rendered harmless. The court's antiseptic procedure minimized the risk attending contact with outside influences. Given that procedure, that a dissenting juror would have violated his or her juror's oath—once when responding to the collective poll and again when responding to the individual poll—and would have violated his or her oath as a witness is too small a risk to shake us. We are satisfied beyond a reasonable doubt that the initial error was rendered harmless.

### 3. Post-Arrest Statements

After arresting Coulthard, the police handcuffed and drove him to the sheriff's department in a police car. Two officers and probation officer Edward Ross were in the car. The record shows that one of the police officers asked Coulthard if he understood "Miranda," and Coulthard said that he did. When Coulthard asked Ross if his family knew about the incident, Ross answered that no one had yet contacted his family, and Coulthard

replied that "this is going to kill my dad." Coulthard argues that because he was not read his *Miranda*[5] rights and because the trial court failed to determine whether he voluntarily made the statements concerning the incident and his father, it was error to admit them. We disagree.

*Miranda* does not apply. "[T]he special procedural safeguards outlined in Miranda are required not where a suspect is simply taken into custody, but rather where a suspect in custody is *subjected to interrogation.*" *Rhode Island v. Innis,* 446 U.S. 291, 300 (1980) (emphasis added). Coulthard was not interrogated before or during his conversation with Ross.

We reject Coulthard's argument that the trial court erred by failing to hold a *Goodchild*[6] hearing to determine whether his statements were made voluntarily. A trial court need not conduct a *Goodchild* hearing on its own motion, unless the issue of voluntariness is raised. *Pickens v. State,* 96 Wis. 2d 549, 575–76, 292 N.W.2d 601, 614 (1980). Coulthard did not raise the issue at the trial.

### 4. Jury Views of Shooting Scene and Tractor

The trial court granted the state's request for a daytime view of the place where the shooting had occurred. Coulthard asserts that error resulted, because the view

---

[5]*Miranda v. Arizona,* 384 U.S. 436 (1966).

[6]*State ex rel. Goodchild v. Burke,* 27 Wis. 2d 244, 133 N.W.2d 753 (1965), *cert. denied,* 384 U.S. 1017 (1966). A *Goodchild* hearing is a separate proceeding conducted by the trial court to determine whether a defendant's statements were made voluntarily.

was not during the same season and at same time of day when the shooting occurred. His argument has no merit.

The purpose of a jury view is to assist the jury in understanding the evidence. *Townsend v. State,* 257 Wis. 329, 334, 43 N.W.2d 458, 460 (1950). Whether to permit a view is in the trial court's discretion. *State v. Marshall,* 92 Wis. 2d 101, 124, 284 N.W.2d 592, 602 (1979).

A view of the scene of the shooting gave the jury an idea of the local terrain and highways and the relative locations of the sites described in testimony. Since that assisted the jurors' understanding of the evidence, granting the view was within the trial court's discretion. The possibility of confusion was slight at best. The jurors knew the date and hour of the shooting.

The trial court granted the state's motion for a view of the tractor that Coulthard drove on the night of the shooting. Coulthard asserts that because the tractor's appearance had changed, it had no connection with any facts sought to be proven at the trial.

The trial court did not err. The view of the tractor assisted the jury in understanding the testimony. The view was intended to show the jurors how much room Coulthard had to maneuver inside the cab. He had testified how he moved the shotgun inside the cab. A rebuttal witness had testified that it was difficult to do so in the manner Coulthard had described. The degree of difficulty was relevant to the issue of Coulthard's intent to kill. The change in the tractor's appearance was that its windshield and a window, which had been shattered, had fallen out. When it granted the view, the court stated

that it would explain to the jury the tractor's changed condition.

Coulthard argues that the tractor view was unfairly prejudicial, in that it was not on "neutral" ground. The tractor and Deputy Reuter's squad car were in the same county garage, but no prejudice occurred. The prosecutor noted that the squad car would be removed before the view took place. Coulthard's counsel made no other objection regarding the "neutrality" of the county garage.

Coulthard's counsel suggested that Coulthard, accompanied by a deputy, attend the views in counsel's car. The court ruled that Coulthard would be shackled and ride in a police car. Coulthard asserts that the ruling denied him his rights of confrontation and due process, his counsel having determined that because of the two requirements, Coulthard would not attend the view. In a pretrial order the court had directed that Coulthard not be restrained in the presence of the jury. He argues that since the jury views were not conducted in the same manner and under the same conditions as the trial, he was deprived of his constitutional rights.

A defendant has the right to be present at every stage of trial, *State v. Haynes,* 118 Wis. 2d 21, 25, 345 N.W.2d 892, 894 (Ct. App. 1984), but it is within the discretion of the trial court to order that a defendant be restrained. *Flowers v. State,* 43 Wis. 2d 352, 363, 168 N.W.2d 843, 849 (1969). The court must state its reasons for a restraint. *State v. Clifton,* 150 Wis. 2d 673, 682, 443 N.W.2d 26, 29 (Ct. App. 1989).

Here the trial court stated its reasons for ordering that Coulthard be shackled. Given the nature of the

charges against Coulthard, the trial court was concerned for the safety of the jury and, indeed, Coulthard's own security. Ordering shackles as a pre-condition to his attendance was a reasonable decision within the court's discretion. *Clifton,* 150 Wis. 2d at 682-83, 443 N.W.2d at 29-30.

■

Defendant did not specifically object to the requirement that he travel separately from the jurors. He therefore failed to preserve the issue for review. *State v. Hartman,* 145 Wis. 2d 1, 9, 426 N.W.2d 320, 323 (1988) (objection preserves for record only the specific grounds stated in the objection). Moreover, the trial court's security concerns justified its ruling that Coulthard travel separately from the jury.

5. Closing Arguments

■

The prosecutor argued to the jury that Coulthard believed Deputy Reuter was stopping him because somebody had reported he had shot a sign. Coulthard contends that the argument was improper. We do not address the contention. Coulthard did not object to the argument or move to strike it. He failed to preserve the issue for appellate review.

■

A pretrial ruling prevented the prosecution from introducing evidence regarding the nature of Coulthard's past convictions. Referring to Coulthard's state of mind when the deputy stopped him, the prosecutor asked the jury to consider that he "has already gone to jail for criminal damage to property so that when Deputy Reuter comes upon him, he sees himself in a position of returning to jail." Coulthard argues that the factual statement was improper. We disagree.

590

In his opening statement before the jury heard evidence, defense counsel detailed Coulthard's past convictions, including one for criminal damage to property. Coulthard himself testified to that conviction. Consequently, the prosecutor's reference during closing argument to the conviction for criminal damage was not improper.

6. Presentence Report

Coulthard argues that because probation officer Ross testified against him and prepared the presentence report, he was denied due process. We reject his argument.

A defendant's due process rights include the right to be sentenced on the basis of true and correct information. *State ex rel. LeFebre v. Israel,* 109 Wis. 2d 337, 345, 325 N.W.2d 899, 903 (1982) (per curiam). Failure of a presentence report to provide the court with true and correct information may deprive a defendant of liberty without due process. *Bruneau v. State,* 77 Wis. 2d 166, 174-75, 252 N.W.2d 347, 351-52 (1977).

Coulthard does not claim that his presentence report is inaccurate. He merely asserts that because probation officer Ross participated in his arrest, Ross could not prepare a presentence report according him due process. The argument is an assumption rather than an exercise in logic, in the absence of a showing that Ross provided inaccurate information which the court used when sentencing Coulthard.

7. Parole Eligibility

██

Section 973.014, Stats., provides that when a court sentences a person to life imprisonment for a crime committed on or after July 1, 1988, the court must make a parole eligibility determination and choose one of two options: that the person is eligible for parole under sec. 304.06(1), Stats., or the person is eligible for parole on a date set by the court. The trial court sentenced Coulthard to life imprisonment with parole eligibility to begin after twenty-five years. Coulthard asserted in his post-conviction motion and on appeal that because the statute provides no standards for setting a parole date, his right to due process was violated. We do not address the argument. The supreme court of this state rejected it in *State v. Borrell,* 167 Wis. 2d 749, 771, 482 N.W.2d 883, 891 (1992).

8. Discretionary Reversal

██

Coulthard asks that we exercise our discretionary power of reversal under sec. 752.35, Stats. That statute empowers us to order a new trial if it appears from the record that the real controversy has not been fully tried or that it is probable that justice has for any reason miscarried. The real controversy was fully tried. We cannot reverse on grounds that a miscarriage of justice has occurred unless we are satisfied that a new trial will produce a different result. *Vollmer v. Luety,* 156 Wis. 2d 1, 16, 456 N.W.2d 797, 804 (1990). We are far from satisfied that such is the case. We decline to order a new trial under sec. 752.35.

*By the Court.*—Judgment and order affirmed.