State of Wisconsin, Plaintiff-Respondent,
v.
Julian Lopez, Defendant-Appellant.
No. 03-1886-CR.
Court of Appeals of Wisconsin.
Opinion Filed June 29, 2004.
Before Wedemeyer, P.J., Fine and Curley, JJ.
¶1 PER CURIAM.
Julian Lopez appeals from a judgment of conviction after a jury found him guilty of first-degree intentional homicide, while armed, party to a crime, contrary to WIS. STAT. §§ 940.01, 939.05 and 939.63 (2001-02).[1] He also appeals from orders denying his postconviction motions.
¶2 Lopez asserts three claims of error: (1) his rights to a fair trial, due process, and an impartial jury were violated when the jury was allowed to observe him under extraordinary security during a jury view of the crime scene; (2) the trial court improperly denied his request for an evidentiary hearing to determine whether the jurors received extraneous, prejudicial information prior to reaching their verdict; and (3) the trial court erroneously exercised its sentencing discretion when it sentenced him to life imprisonment without the possibility of parole.
¶3 Because Lopez's rights to a fair trial, due process and an impartial jury were not violated during the jury view; because the trial court properly exercised its discretion in denying an evidentiary hearing on the extraneous information issue; and because the trial court properly exercised its sentencing discretion in imposing a life sentence without the possibility of parole, we affirm.

BACKGROUND
¶4 In June 2000, a jury found Lopez guilty as a party to the drug-related crime of first-degree intentional homicide of Anthony Davis. On March 17, 1999, Davis was employed as a driver for the Garden Fresh Produce company. Shortly before 9:00 a.m., Davis returned from a driving run to a loading dock of the company's building located at 726 South 12th Street in Milwaukee's near south side. As he stepped from his truck, he was ambushed and fatally shot.
¶5 Lopez and a co-defendant, Loyd Guzior, were charged and a jury trial was scheduled. Shortly before the trial, however, Guzior entered into a plea agreement. Accordingly, the trial involved Lopez only. Before testimony began, the trial court granted the State's request for a jury view, and informed the jury that it would be taken to several sites to view the physical circumstances of the incident. The court instructed the jury how it was to conduct itself during the view. During the view, four armed guards were present.
¶6 When the jury returned from its viewing exercise, but before any testimony was taken, the trial court went on the record to describe the sites visited and to state that the presence of security guards was a standard practice. Furthermore, the court instructed the jury not to draw any conclusion from the presence of the four guards. Defense counsel objected that the security precautions were excessive and moved to dismiss. The motion was denied. At the request of defense counsel, the trial court then instructed the jury not to draw any negative inference from the presence of the security guards because the procedure utilized was for everyone's protection. The jury found Lopez guilty as charged. The court sentenced Lopez to life imprisonment without eligibility for parole. Lopez filed postconviction motions, which were denied without a hearing. Lopez now appeals.

ANALYSIS

A. Jury View.
¶7 Lopez claims the trial court erred when it summarily denied his postconviction motion for a new trial alleging constitutional violations based on the jury-viewing trip wherein the jury was allowed to see him under the guard of four security officers. His claim is based upon the assertion that his counsel did not receive notice of the nature of the security procedures to be utilized, and thus was unable to advise him whether and how he was to participate in the view. He argues he should have been afforded the opportunity "to either suggest alternatives, or to decline to participate in the view and thereby eliminate the need for the precautions." He further complains that the view was not recorded and that the jury was not properly instructed about the view. To support his claim of constitutional deprivations, he asks us to remand the case to the trial court for an evidentiary hearing so that he can make a complete record regarding the circumstances of the jury view. We reject his request.
¶8 The standards of appellate review of a trial court's determination that no evidentiary hearing is required to decide a postconviction motion as enunciated in State v. Bentley, 201 Wis. 2d 303, 309-11, 318, 548 N.W.2d 50 (1996), also apply in other procedural circumstances where an alleged aggrieved seeks relief. State ex rel. Booker v. Schwarz, 2004 WI App 50, ¶15, ___Wis. 2d ___, 678 N.W.2d 361. If a trial court fails to adequately explain its reasoning in exercising its discretion, this court will independently review the record for a basis to uphold the trial court's ruling, State v. Pharr, 115 Wis. 2d 334, 343, 340 N.W.2d 498 (1983), under the general rubric of "right result, wrong reason."
¶9 The trial court concluded that Lopez had not set forth a sufficient basis for an evidentiary hearing on the issue raised. For reasons to be stated, we hold that the record conclusively demonstrates that Lopez is not entitled to relief on his claim. Thus, the trial court did not erroneously exercise its discretion in denying Lopez's request for an evidentiary hearing.
¶10 As a preliminary matter, we conclude that the trial court did not erroneously exercise its discretion in granting the State's request for a jury view. A trial court may order a view by the jury. WIS. STAT. § 972.06. Whether to permit a view is in the trial court's discretion. State v. Marshall, 92 Wis. 2d 101, 124, 284 N.W.2d 592 (1979). An accused has the right to be present at every stage of a trial, but it is within the discretion of the trial court to order that the accused be restrained, be it at a jury view or in the courtroom. The court must state its reasons for restraint, if the restraint occurs in the courtroom. See State v. Coulthard, 171 Wis. 2d 573, 589, 492 N.W.2d 329 (Ct. App. 1992). This standard, however, is often relaxed in an out-of-court setting, depending upon the circumstances. State v. Cassel, 48 Wis. 2d 619, 625, 180 N.W.2d 607 (1970). The trial court provided adequate reasons for granting the State's request, and Lopez does not take issue with the trial court's decision to permit the jury view. Lopez's complaints focus on his lack of notice of the nature of the security procedures and the failure to record the view. We reject Lopez's complaints.
¶11 First, we conclude that the complaints related to lack of notice, and the defense's inability to provide input, are without merit. The chronological events and available information leading to the jury view in the case before us are as follows. Prior to trial, on May 11, 2000, the State filed motions for a jury view and jury sequestration. The latter practice is rarely used today except in unusual circumstances trumping budgetary concerns. On May 24, 2000, the court ordered the State to provide both the court and the defense the scope of the jury view. The State complied with this order on May 31, 2000. The map depicting the area for view was then placed under seal. The motion for jury sequestration was then considered. In support of its motion, the State argued in part:
[A]s the Complaint in this case, as well as the Court records dealing with the cases describe, this is a situation where this individual was sought out ... as a result of monies apparently owed  a drug debt. He was assassinated.
Federal materials describe a group of individuals who are united in ... a drug organization ... that was heavily armed. The fact that ... there's still those who were not indicted federally, who are associated with the Lopez family, and not all the weapons were believed to have been recovered  is part of the ... discovery in the federal case that is part of the discovery in the State case. It ... has been provided. They were well armed ....
This is not your typical case. In fact, that in the [Khaled] J[i]lani matter it has been asserted that there was even consideration ... of taking action against witnesses ... is another consideration that this Court should weigh in sequestering the jury.
Lopez's counsel offered no response to these remarks. The court then ordered that the jury list be placed under protective order and seal.
¶12 By the time of trial, June 12, 2000, Lopez had been charged with another "execution-style" homicide of Khaled Jilani, who was killed on March 21, 1999. In addition, he was named co-conspirator in a federal drug prosecution. Consequently, he was in state custody as well as federal custody. These facts, known to all parties concerned, demonstrated that this case involved a serious security risk. The trial court granted the State's request for a jury view and sequestration. The jury view occurred on June 13, 2000.
¶13 From this review of the events preceding the staging of the jury view, we conclude that Lopez's counsel had more than enough time to consult with Lopez about the implications of the viewing trip, and sufficient opportunity to consider the consequences of the potentially dangerous circumstances presented, and what security precautions may be taken. In fact, Lopez's trial counsel admitted knowing that "there was going to be extra security." The real concern for the safety of witnesses, and the need to prevent juror intimidation, was undisputed. The only matter left unresolved was assuring the safety of Lopez and individuals in the immediate proximity of the various sites for view from the intended or unintended results of any effort to retaliate.
¶14 Whether and to what extent an accused should be subject to restraints during a jury view is a matter for the sheriff or the police to determine because such custodian is responsible for the safekeeping of the accused. Cassel, 48 Wis. 2d at 625. Lopez was conveyed to the five sites in a separate police van. At three of the sites, when not in the van, he was accompanied by four armed officers. These security precautions were not unreasonable given the security risks associated with this case. Based on the foregoing, we conclude that Lopez was afforded sufficient opportunity to be informed about security issues and to make decisions regarding the jury view.
¶15 Second, we reject Lopez's complaint that the jury view should have been recorded. In its written decision denying Lopez's postconviction motion, the trial court noted that WIS. STAT. § 972.06 does not require that a jury view be recorded. It further cited language from Cassel declaring that "[t]he record need not show restraints were warranted before and after the accused's appearance in the courtroom. People normally expect to see a prisoner under some restraints in situations where he is able to escape if not in restraints." Id., 48 Wis. 2d at 625. The court acknowledged that the level of security used was more severe than that employed in Cassel, nevertheless, it found that such measures were appropriate for the reasons set forth by the prosecution as noted above.[2]
¶16 Third, any alleged prejudice relative to the security issues at the jury view was cured by the frequent cautionary instructions to the jury. The trial court provided a special instruction to the jury cautioning them to avoid forming any negative impressions from the circumstances of the view. In fact, the court instructed the jury in such a manner on multiple occasions. The first instruction occurred before the jury left for the view. The trial court declared: "What you see there is not evidence in the case and you should not consider it as evidence." While the jury was en route to the sites, at the request of defense counsel, the court further advised the jury that the security employed was "standard operating procedure."
¶17 When the trial reconvened, but before testimony commenced, defense counsel moved to dismiss essentially for all the reasons raised to support this claim of error. The trial court summarized, on the record, the sites visited. It iterated that "this is not unnatural security that we go through in order to protect themselves and the Court, and it's not unusual, and I said not to draw any conclusions to that ...." Defense counsel objected to the procedure used at three of the sites. More specifically, when Lopez exited his van, he was accompanied by four armed officers. He also remarked that from his standpoint the security "was awful." At the sites, people were walking around, "coming out of buildings, doorways were open that should have been secured ... not a [soul] should be around."[3] In response, the State repeated most of the same points it had made in requesting a sequestered jury. It emphasized that the steps taken were not extraordinary, but were determined by the Sheriff's Department under the totality of the circumstances. The trial court, in denying the motion, stated it "wasn't informed until just beforehand also that there potentially could be security  we went ahead and did it based upon the organization of the Department ...."
¶18 Finally, just before the first witness was called to testify at the behest of defense counsel, the court instructed the jury: "The view of the scene, we take those precautions, just so you understand that. You are not supposed to draw any negative inference from the security that is out there. It is for everyone's protection, okay." Jurors are presumed to follow the instructions they are given. State v. Williamson, 84 Wis. 2d 370, 396, 267 N.W.2d 337 (1978). We presume that occurred here.
¶19 In denying the motion for a hearing, the trial court succinctly declared that Lopez had not set forth a sufficient basis for an evidentiary hearing on the issue. This was a discretionary call. It was a conclusion that another court might not reach. To sustain that conclusion, however, requires only that there is a reasonable basis in the record to support the judgment made by the court. From our elucidation of the circumstances existing in the record, we conclude the record is so lacking in evidentiary support that it conclusively demonstrates that Lopez is not entitled to relief on his claim.

B. Extraneous Information.
¶20 Lopez claims the trial court erroneously exercised its discretion in denying his request for a postconviction hearing to determine whether jurors received extraneous prejudicial information prior to reaching a verdict. He reasons as follows. The trial court ordered the jury to be sequestered and further ordered the transcript of the jury selection and jury verdict sealed to protect the identity of the jurors. Because of these circumstances, it would be inappropriate for counsel for either party to attempt to contact or interview any of the jurors regarding possible contamination of the jury by extraneous prejudicial information without the approval of, and direction from, the court.
¶21 Lopez builds his bridge of logic based upon Cassel. In Cassel, the accused, while being transferred from the courtroom to the jail, was seen by some jurors handcuffed and chained. Id., 48 Wis. 2d at 623. Cassel claimed these observances prejudiced the jury and the court should have granted a motion for a new trial. Id. The supreme court affirmed the denial of the motion for two reasons. Id. at 623-25. First, it considered seeing an accused in restraints in a courtroom of greater significance than outside the courtroom. Id. at 625. In the former instance, the likelihood of prejudice is far greater. Id. In the latter instance, the effect is psychologically different in that it is not constant. Id. Second, the jury had been polled after the receipt of the verdict as to whether the verdict was influenced by the fact that some members of the jury saw the accused in restraints. Id. Thus, Lopez reasons that Cassel "implicitly approves such a procedure," i.e., reconvening the jurors in a hearing to determine if extraneous prejudicial information was received by any of them prior to reaching their verdict.
¶22 As the argument stands, we find no fault in its logic except for the fact that when Cassel was decided, Nelson v. State, 54 Wis. 2d 489, 195 N.W.2d 629 (1972), Bentley, and their progeny did not exist. With Nelson and Bentley, the bar was raised for entitlement to obtain a hearing for a postconviction motion. Now, conclusory statements cannot form the basis for obtaining relief. Specific statements of fact are required.
¶23 In his motion, Lopez, by his counsel, alleged that during his trial he came into contact with Eddie Crespo, a childhood friend who was also coincidentally a jail officer. Crespo told him:
he was dating a juror who sat for Mr. Lopez['s] trial, that this juror was aware that the defendant was wearing a shock belt during the trial; that the juror had been informed that a key to the courtroom was missing during the jury trial; and that the juror was very upset and afraid during the trial due to the security procedures used for the jury view and the information regarding a missing key to the courtroom.
¶24 Citing Nelson, the trial court ruled that Lopez may not rely upon conclusory inferences to obtain a hearing. Id., 54 Wis. 2d at 497-98. It concluded that Lopez failed to allege sufficient facts to raise a question of fact because only conclusory statements were alleged. The trial court did not err.
¶25 A review of the postconviction motion document more than adequately supports the trial court's ruling. The motion is presented over the signature of Lopez's postconviction and appellate counsel. There are attached to the motion no affidavits from Lopez, from Crespo, from the unnamed juror, nor from the unnamed informant who supposedly informed the unnamed juror that the courtroom key was missing. Absent any affidavits, all that exists in the motion document are counsel's conclusions as to how Lopez will testify, how Crespo will testify, and the conclusive speculation about the unnamed juror's "awareness" that during the trial Lopez was wearing a shock belt. From this cursory review, it is self-evident that the motion document is nothing more than the cobbling of cacophonous conclusions rising no higher than rank speculation and are inadequate to satisfy the dictates of Bentley.[4]

C. Sentencing.
¶26 Finally, Lopez claims the trial court erroneously exercised its sentencing discretion by sentencing him to life imprisonment without the possibility of parole eligibility. He claims the trial court failed to explain how the factors relevant to a determination of parole eligibility related to the particular facts of this case.
¶27 When reviewing a sentencing court's disposition, there is a consistent and strong policy against interference with the discretion of the trial court in passing sentence. State v. Paske, 163 Wis. 2d 52, 61-62, 471 N.W.2d 55 (1991). This policy is based on the great advantage the trial court has in considering the relevant factors and the demeanor of the defendant. State v. Harris, 119 Wis. 2d 612, 622, 350 N.W.2d 633 (1984). Furthermore, the trial court is presumed to have acted reasonably, and the burden is on the appellant to show some unreasonable or unjustifiable basis in the record for the sentence complained of. State v. Thompson, 172 Wis. 2d 257, 263, 493 N.W.2d 729 (Ct. App. 1992). A trial court's sentence is reviewed for an erroneous exercise of discretion. Paske, 163 Wis. 2d at 70.
¶28 It is similarly well established and undisputed by the parties in this case, that trial courts must consider three primary factors in passing sentence. Those factors are the gravity of the offense, the character and rehabilitative needs of the defendant, and the need to protect the public. Id. at 62. The weight to be given to each of the factors, however, is a determination particularly within the discretion of the trial court. Ocanas v. State, 70 Wis. 2d 179, 185, 233 N.W.2d 457 (1975). After consideration of all relevant factors, the sentence may be based on any one of the three primary factors. State v. Krueger, 119 Wis. 2d 327, 338, 351 N.W.2d 738 (Ct. App. 1984).
¶29 The sentencing court may also consider additional factors, including the defendant's criminal record, history of undesirable behavior patterns, personality and social traits, results of a presentence investigation, the aggravated nature of the crime, degree of culpability, demeanor at trial, remorse, repentance and cooperativeness, educational and employment history, the need for close rehabilitative control, and the rights of the public. State v. Lewandowski, 122 Wis. 2d 759, 763, 364 N.W.2d 550 (Ct. App. 1985).
¶30 The erroneous exercise of discretion "might be found if the trial court failed to state on the record the material factors [that] influenced its decision, gave too much weight to one factor in the face of contravening considerations, or relied on irrelevant or immaterial factors." Krueger, 119 Wis. 2d at 337-38. The exercise of a sentencing court's discretion requires a demonstrated process of reasoning based on the facts of the record and a conclusion based on a logical rationale. McCleary v. State, 49 Wis. 2d 263, 277, 182 N.W.2d 512 (1971). The trial court must engage in an explained judicial reasoning process and explain the reasons for its actions. However, even if the trial court fails to adequately set forth its reasons for imposing a particular sentence, the reviewing court will not set aside the sentence for that reason. The reviewing court is obliged to search the record to determine whether, in the exercise of proper discretion, the sentence imposed can be sustained. Id. at 282.
¶31 The factors that a sentencing court considers when imposing a sentence are the same factors that influence the determination of parole eligibility. Parole eligibility date determinations are reviewable under the same standards as are other sentencing decisions. State v. Setagord, 211 Wis. 2d 397, 416, 565 N.W.2d 506 (1997). Thus, we limit our review to determining whether there has been an erroneous exercise of discretion. With these many sentencing standards of review in mind, we now examine Lopez's assertion of erroneous exercise of sentencing discretion.
¶32 Lopez was sentenced by the trial court to life imprisonment without eligibility for parole. Prior to sentencing, the State, by the special sentencing committee of the Milwaukee County District Attorney's office, recommended life without eligibility for parole. The district attorney representing the State made a strong statement supporting the recommendation. The mother and the wife of Anthony Davis made short statements to the court also endorsing the recommendation. Defense counsel asked the court to consider seriously that Lopez was the father of three children, a good family man, and had been successfully operating his own business with no criminal record. Because there was some doubt as to who was responsible for the gunshot to the head of the victim and the accomplice had been sentenced to forty-five years of imprisonment, defense counsel urged the court to impose a parole eligibility in the thirty-year range.
¶33 The trial court's sentencing statement consisted of five transcript pages. After it had recited the factors that it must necessarily consider, it also mentioned the optional factors it could consider. It then applied these factors to the facts produced by the evidence.
¶34 It first discussed the nature of the offense. Stating the obvious, it made mention of the impact that the homicide had on the immediate family and community in which the Davis family lived. It characterized the crime as calculated by individuals wearing masks, who made detailed preparations to commit the crime, and took careful precautions to avoid discovery. It noted that the results of a drug-dealing culture permeated the entire trial. The purpose of the shooting was to send a message to others that they had better pay their drug debts. Finally, returning to the specific nature of homicide, it briefly alluded to the number of shots that were fired and then bluntly described the event as an assassination.
¶35 The court next examined Lopez's character. Implicitly observing that one knows another individual by one's actions, the court reflected on what type of a person would commit such an act and engage in such activities that put so many innocent people in harm's way. Although the court credited Lopez with being pleasant and cooperative, his actions in committing this crime were egregious and continuing. Because of the nature of this crime and its accompanying circumstances, the court determined that rehabilitation in its judgment "won't happen!"
¶36 Lopez argues that the trial court failed to explain how the factors it employed in its sentence required the abrogation of parole eligibility. In doing so, Lopez separates six factors mentioned by the trial court and then, in reply, questions why each individual factor requires eliminating parole eligibility. To separate, distinguish and eliminate is a very effective rhetorical technique, but a sentencing review is not an exercise in sophistry. Rather, it is an inquiry as to whether a process of reasoning occurred based upon facts of the record and whether the conclusion reached had a logical connection to the facts. McCleary, 49 Wis. 2d at 277. From this examination of the sentencing transcript, we are satisfied that the trial court's sentencing discretion was properly exercised.
By the Court.Judgment and orders affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)5.
NOTES
[1] All references to the Wisconsin Statutes are to the 2001-02 version unless otherwise noted.
[2] Lopez additionally complains that the jury was not properly instructed about the view to take place. Yet, he offers no explanation why the instruction was improper, or how it should have been instructed. Nor does he cite any authority for his claim. When issues are inadequately briefed, we have no obligation to respond. State v. Pettit, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992).
[3] Lopez's argument regarding the extensive security is fatally flawed in that it is conflicting in content. On the one hand, he decries the presence of four armed deputy sheriffs at three of the sites as dictated by the Sheriff's Department when his counsel knew that extra security precautions would be required; on the other hand, he complains the "security was awful...." He cannot have it both ways.
[4] Included in this claim is the assertion (third-hand at best) that the security procedures played a role in reaching a verdict. Because we have already addressed this issue in disposing of Lopez's first claim of error, we eschew any further discussion of the claim.